*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 08a0222p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

No. 07-5408

PEDRO PACHECO-LOPEZ,

*Defendant-Appellant.*

>

Appeal from the United States District Court
for the Western District of Kentucky at Louisville.
No. 06-00049—Charles R. Simpson III, District Judge.

Argued: December 6, 2007

Decided and Filed: June 26, 2008

Before: MERRITT, COLE, and GRIFFIN, Circuit Judges.

———————————

## COUNSEL

**ARGUED:** Kent Wicker, REED WICKER, Louisville, Kentucky, for Appellant. Madison T. Sewell, ASSISTANT UNITED STATES ATTORNEY, Louisville, Kentucky, for Appellee. **ON BRIEF:** Kent Wicker, REED WICKER, Louisville, Kentucky, for Appellant. Laura L. Hall, Terry M. Cushing, Monica Wheatley, ASSISTANT UNITED STATES ATTORNEYS, Louisville, Kentucky, for Appellee.

MERRITT, J., delivered the opinion of the court, in which COLE, J., joined. GRIFFIN, J. (pp. 10-12), delivered a separate dissenting opinion.

———————————

## OPINION

———————————

MERRITT, Circuit Judge. The defendant, Pedro Pacheco-Lopez (Lopez), challenges the district court's denial of his request to suppress certain statements made prior to his arrest. The defendant argues that his initial statements – made prior to receiving his *Miranda* warnings – should have been suppressed because they were responses to a custodial interrogation and do not fall under the "booking exception" to *Miranda*. Additionally, the defendant argues that his later admission, made after receiving his warning, resulted from impermissible "*Miranda*-in-the-middle" questioning. Because the booking exception applies narrowly to biographical questions and has rarely been applied outside of a police station, we hold that the defendant's first statements should have been suppressed. We similarly find that Lopez's post-*Miranda* admission should be suppressed. Accordingly, the district court's decision is REVERSED.

## I. Facts

On March 13, 2006, undercover officers arrested Gerardo Castro-Acosta and others on Clay Avenue in Louisville, Kentucky, during an arranged "controlled buy" of sixteen kilograms of cocaine. The individuals involved in the drug deal had arrived in a white Subaru car and a red Dodge pickup truck. After making the arrests, the police obtained a search warrant for 6006 Cooper Chapel Road, the address in Louisville for the cars registered under Acosta's name. When the police arrived at the home, they found the defendant, Lopez, and another individual identified as Bernal-Bajo. The officers had no information concerning either of the men when they were discovered at the residence.

The officers executing the search warrant immediately handcuffed Lopez and placed him at the kitchen table for questioning. The exact sequence of events during the questioning is unclear, however, because each of the three officers who testified at the July 10, 2006, suppression hearing recalled the events in a slightly different manner.[1] The district court judge relied primarily on DEA Agent Mark Slaughter's testimony after finding that Kentucky State Trooper Lagrange's testimony was "somewhat imprecise" and that Agent Brian Bester was not present. In accordance with the district court's factual finding, as well as the fact that one officer admitted to remembering the facts incorrectly, we give greatest weight to Officer Slaughter's account.

Slaughter testified that the detainee, Lopez, was initially asked questions related to securing the residence and to his identity. Slaughter, who does not speak Spanish, discovered that the detainees did not speak English and obtained translating assistance from Lagrange. Slaughter asked Lopez his name and where he lived; the detainee responded that he lived in Mexico and not at the Cooper Chapel Road residence. Slaughter next asked Lopez when he arrived at the house and how he had gotten there. Lopez responded that he had driven from Mexico the previous Sunday in a white Ford pickup truck; he then volunteered the keys to the pickup. At that point, Lopez was advised of his *Miranda* rights in Spanish by Lagrange. Immediately thereafter, Slaughter asked Lopez whether he or Bernal-Bajo had brought any cocaine to the residence. Lopez acknowledged that he had transported cocaine. Slaughter and Lagrange then took Lopez to a bedroom for further questioning,[2] at which time Lopez indicated that he did not want to speak further with the investigators.[3] No further questioning occurred. Slaughter then went to the garage to assist in an inspection of the white pickup, where officers discovered that the drive shaft of the truck had been hollowed out to accommodate cocaine.[4]

Lopez entered a guilty plea conditioned on the outcome of his motion to suppress the statements. The district court judge, describing the characterization of the pre-*Miranda* questions as the "key factor" in the case, held that the initial interaction was not an "interrogation." Dist. Ct. Op. at 2. The judge's description of the initial questions as "relatively innocuous" and only important with the benefit of "20/20 hindsight" informed this ruling. *Id.* As a result, "the additional questions asked and answered after the *Miranda* warning [were] not subject to suppression under *Seibert*." *Id.* at 3.

---

[1] Only DEA Officer Mark Slaughter and Kentucky State Trooper Albert Lagrange, who served as the translator, were actually present during the questioning. DEA Special Agent Brian Bester, who was the lead agent on the case, was not present, but testified based on a second-hand account.

[2] The officers suspected that Bernal-Bajo might be trying to intimidate Lopez and thus took him to the bedroom.

[3] The record is unclear whether Lopez specifically invoked his right to silence, or merely indicated that he did not wish to speak further to the investigators.

[4] The cocaine purchased at Clay Street was in a cylindrical shape corresponding to the drive shaft.

Lopez filed a timely appeal and argues that the initial questions did constitute an "interrogation" and that the answers, along with the subsequent, post-*Miranda* statements, should be suppressed.

## II.  Interrogation and the "Booking Exception"

In cases involving a motion to suppress, this Court reviews the district court's factual findings for clear error and its legal conclusions *de novo*. *United States v. Meyer*, 359 F.3d 820, 824 (6th Cir. 2004).  Additionally, when reviewing a district court's denial of a motion to suppress, we review the evidence in the light most favorable to the United States. *United States v. Erwin*, 155 F.3d 818, 822 (6th Cir. 1998).

Before the police may interrogate a suspect in custody,[5] they must first read the *Miranda* warnings. *Miranda v. Arizona*, 384 U.S. 436 (1966).  An "interrogation" comprises "not only [] express questioning, but also any words or actions on the part of the police that the police know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980).  *Miranda* warnings are not, however, required for questions "reasonably related to the police's administrative concerns," such as the defendant's name, address, height, weight, eye color, date of birth and current address. *Pennsylvania v. Muniz*, 496 U.S. 582, 601 (1990); *United States v. Clark*, 982 F.2d 965, 968 (6th Cir. 1993) ("ordinarily . . . the routine gathering of biographical data for booking purposes should not constitute interrogation under *Miranda*").[6]  This "booking exception" to *Miranda* requires the reviewing court to carefully scrutinize the facts, as "[e]ven a relatively innocuous series of questions may, in light of the factual circumstance and the susceptibility of a particular suspect, be reasonably likely to elicit an incriminating response." *United States v. Avery*, 717 F.2d 1020, 1025 (6th Cir. 1983).  Where the booking exception does not apply to statements made before administration and voluntary waiver of *Miranda* rights, those statements are "irrebuttably presumed involuntary" and must be suppressed. *United States v. Mashburn*, 406 F.3d 303, 306 (4th Cir. 2005) (citing *Oregon v. Elstad*, 470 U.S. 298, 307 (1985)).

This case requires further delineation of the line between questions relating to the processing of an arrest that are biographical and questions of an investigatory nature.  The latter, but not the former, constitute "interrogation" and implicate the Fifth Amendment and the attendant *Miranda* warning requirement. *Compare Avery*, 717 F.2d at 1024 (question was part of a "routine procedure to secure biographical data" and thus not interrogation), *and United States v. King*, 156 F.3d 29 (6th Cir. 1998) (per curiam) (holding that a defendant's response to a question about his address was not protected by *Miranda*, notwithstanding the fact that police made use of the statement, because it was not intended to elicit incriminating statements), *with United States v. Soto*, 953 F.2d 263 (6th Cir. 1992) (per curiam) (suppressing a response to a question about what a defendant was doing with drugs), *and United States v. Cole*, 315 F.3d 633, 636 (6th Cir. 2003) (suppressing defendant's initial response to the question, "Whose gun is this?" but denying the motion to suppress later, voluntary statements), *and United States v. Downing*, 665 F.2d 404 (1st Cir. 1981) (suppressing a question regarding the location of an airplane).

Lopez's pre-*Miranda* statements cannot be described as merely biographical, but instead resulted from an interrogation subject to the protections of *Miranda*.  Some of the initial questions would not – in isolation – implicate *Miranda*; at the very least, asking the defendant his name is the

---

[5] The government does not contest the fact that Lopez was in custody during the period of time at issue.

[6] The Sixth Circuit adopted the equivalent of a "booking exception" before the Supreme Court officially recognized as much in *Pennsylvania v. Muniz*. *See United States v. Avery*, 717 F.2d 1020 (6th Cir. 1983).

type of biographical question permitted under the booking exception. But asking Lopez where he was from, how he had arrived at the house, and when he had arrived are questions "reasonably likely to elicit an incriminating response," thus mandating a *Miranda* warning. The fact that Officer Slaughter did not actually know that Lopez was involved in criminal activity does not affect our analysis. The officers who questioned Lopez did know that the shipment of cocaine involved in the arranged buy had arrived from outside the state during the previous week. Consequently, asking questions about when and how Lopez arrived at a household ostensibly linked to a drug sale, as well as his origin, are relevant to an investigation and cannot be described as related only to securing the house or identifying the defendant. Furthermore, the officers immediately ascertained that Lopez did not speak English and learned shortly thereafter that he was from Mexico, factors making him "particularly susceptible" to questioning before *Miranda* warnings. These facts implicate *Miranda*'s concern about the danger of coercion resulting from "the interaction of custody and official interrogation." *See Illinois v. Perkins*, 496 U.S. 292, 296 (1990) (discussing the purpose of Miranda and contrasting a situation where a defendant does not "feel compelled to speak by the fear of reprisal for remaining silent").

The location, the nature of the questioning and the failure to take notes or document the defendant's identity also support our conclusion that the booking exception is not applicable in this case. In the majority of cases where we have applied the booking exception, *see, e.g.*, *Avery*, 717 F.2d 1020, we have done so for questioning that occurred at the police station.[7] Application of the booking exception is most appropriate at the station, where administrative functions such as bookings normally take place. Extending the exception to the type of questioning here – which occurred in a private home during the investigatory stage of criminal proceedings – would undermine the protections that *Miranda* seeks to afford to criminal suspects. Additionally, situations subject to the booking exception usually involve active documentation of a defendant's answers, whereas none of the officers who questioned Lopez recorded any of his responses. Such documentation – including arrest-related paperwork or notes – would be expected during questioning about a defendant's background, as the purpose of such inquiry is to gather sufficient data to identify the defendant (*i.e.* for record-keeping). Here, no documentation occurred, supporting our conclusion that the questions were part of an investigatory interrogation.

Lopez's initial statements resulted from a "custodial interrogation," not biographical questioning subject to the booking exception; consequently, his *Miranda* rights were implicated before the police actually read the warning. Because the police did not administer the *Miranda* warning for these initial questions, the answers are "presumed compelled" and "excluded at trial in the State's case in chief." *Oregon v. Elstad*, 470 U.S. 298, 317 (1985).

### III. *Miranda*-in-the-Middle Interrogations

Midway through the interrogation, the police officers read Lopez his *Miranda* rights in Spanish. Immediately thereafter, they asked him whether he had brought cocaine with him from Mexico, to which he responded in the affirmative. The district court ruled that this statement should be admitted because it found that the earlier line of questioning did not constitute an interrogation. *See Missouri v. Seibert*, 542 U.S. 600, 608-09 (2004) (administering *Miranda* warning before a suspect makes a custodial confession admissible so long as there was proper waiver). Because this conclusion was incorrect, and the earlier statements must be suppressed, the question then becomes whether Lopez's later, post-*Miranda* statement should similarly be suppressed or whether it is

---

[7] We did extend the reasoning in *Avery* to a location outside of the police station in an unpublished opinion, *United States v. Garcia-Torres*, 1 Fed. Appx. 294 (6th Cir. 2001). In *Garcia-Torres*, the defendant produced a fake identification card after the officer requested identification pursuant to a valid *Terry* stop. The Court denied the defendant's motion to suppress this evidence, holding that because the officer had no reason to suspect that the defendant possessed a fake ID card, the request was "not reasonably likely to elicit an incriminating response." *Id.* at 299.

admissible in the prosecution's case-in-chief. The Supreme Court's two principal cases addressing midstream *Miranda* warnings both compel our conclusion that Lopez's post-warning statements must be suppressed. *Compare Seibert*, 542 U.S. at 611-12 (focusing on whether the midstream warning was "effective") (plurality opinion), *with Elstad*, 470 U.S. at 310 (analyzing whether the latter statement was voluntary, an inquiry based on whether the taint of the earlier compelled statements dissipated through the passing of time or changed circumstances).

In *Seibert*, the Supreme Court addressed an interrogation technique wherein the police first purposefully interrogated an unwarned suspect, then apprised her of her *Miranda* rights, and finally asked similar questions again.[8] Specifically, the defendant mother, whose 12-year-old son suffered from cerebral palsy and died in his sleep, feared prosecution and chose to conceal the death by burning the family's mobile home and incinerating the body. To avoid the appearance that the son had been left unattended, the defendant arranged for Donald Rector, a mentally ill teenager living with the family, to stay in the house. Donald then died in the fire. Five days later, the police questioned Seibert at a hospital. On specific instructions from headquarters, the investigating police officer refrained from giving *Miranda* warnings when he first interrogated Seibert. After more than 30 minutes of questioning, during which time the officer repeatedly referenced Donald's death, Seibert admitted that she knew that Donald would die in the fire. Seibert then received a 20 minute coffee break. Upon her return, the officer read her *Miranda* warning, turned on a tape recorder, and then proceeded to ask the same questions. Seibert ultimately confessed to Donald's death.

Five justices agreed to suppress both the pre- and post-*Miranda* statements, while four dissenting justices thought both statements were permissible under the Court's earlier, voluntariness test espoused in *Oregon v. Elstad*. Of the five justices who reached the same result, a plurality of four framed the underlying issue as follows: the "threshold question in [such a] situation is whether it would be reasonable to find that the warnings *could function 'effectively' as Miranda requires*." *Seibert*, 542 U.S. at 612 (emphasis added). The effectiveness inquiry focused, in turn, on whether the suspect "had a real choice about giving an admissible statement at that juncture." *Id*. "For unless the warnings could place a suspect who has just been interrogated in a position *to make such an informed choice*, there is no practical justification for accepting the formal warnings as compliance with *Miranda*, or for treating the second stage of the interrogation as distinct from the first, unwarned and inadmissible segment." *Id*. (emphasis added). The plurality believed that the warnings in Seibert's case did not operate effectively and identified five factors, discussed *infra*, that must be analyzed to ensure that such a warning is effective in every situation where police administer *Miranda* mid-interrogation.[9] *Id.* at 615.

In a concurring opinion, Justice Kennedy similarly disproved of the two-step process at issue in the case, noting that it would "allow police to undermine [the *Miranda* rule's] meaning and effect," but rejected the plurality's test and instead *limited* his critique to two-step situations where the "technique is used in a calculated way to undermine the *Miranda* warning." *Id*. at 622 (Kennedy, J., concurring). According to Justice Kennedy, any statements resulting from an intentional ask first, question later technique must be suppressed.[10] In all other cases, *Elstad* – with its focus on the voluntariness of both the pre- and post-*Miranda* statements – would continue to control the analysis. *Id.* The four dissenting justices in *Seibert* rejected application of a new test

---

[8] As the Fourth Circuit explained, an initial statement preceding the *Miranda* warning is "presumed involuntary." Consequently, the issue is "whether those initial, unwarned statements rendered involuntary the statements [] made *after* receiving and waiving *Miranda* rights. *United States v. Mashburn*, 406 F.3d 303, 306 (4th Cir. 2005).

[9] By applying the test in every instance, the plurality opinion in *Seibert* limits the *Elstad* holding to its facts.

[10] Resolution of whether the police purposefully sought to evade *Miranda* is unnecessary, as Lopez's statements are inadmissible even if the police didn't purposefully implement a question first-warn later strategy.

and simply applied *Elstad*, finding that the later statements were sufficiently voluntary. We believe that Lopez's statements must be excluded under both *Seibert* and *Elstad*.[11]

According to the *Seibert* plurality, the relevant factors for determining whether a midstream *Miranda* warning could be effective are: (1) the completeness and detail involved in the first round of questioning; (2) the overlapping content of the statements made before and after the warning; (3) the timing and setting of the interrogation; (4) the continuity of police personnel during the interrogations; and (5) the degree to which the interrogator's questions treated the second round as continuous with the first. *Seibert*, 542 U.S. at 615. The results of the effectiveness inquiry inform the subsequent analysis: "If yes [to the question of effective warning], a court can take up the standard issue of voluntary waiver and voluntary statement; if no, the subsequent statement is inadmissible for want of adequate *Miranda* warnings, because the earlier and later statements are *realistically seen as parts of a single, unwarned sequence of questioning*." *Id*. at 612 (emphasis added). An analysis of the sequence of events surrounding Lopez's interrogation compel our conclusion that the warning was ineffective, and that his statements were thus the result of a single, unwarned sequence of questioning.

The third, fourth and fifth factors, in particular, inform our determination that the warning in this case was ineffective, as the same officers conducted the interrogation in the same location without any break between the two sets of questions. The interrogation was continuous – the break only lasted for the amount of time it took the investigators to read Lopez the *Miranda* warning. In such a situation, administration of the *Miranda* warning could not lead a suspect to a meaningful understanding that he could cease answering the questions at that point in time. Lopez's interrogation thus implicates the exact problem described by the Supreme Court *Seibert*: "Unless the warnings could place a suspect who has just been interrogated in a position to make [] an *informed choice*, there is no practical justification for accepting the formal warnings as compliance with *Miranda*, or for treating the second stage of interrogation as distinct from the first, unwarned and inadmissible segment." 542 U.S. at 612 (emphasis added). There was no break in the questioning or any effort by the police to ensure that Lopez understood that his prior statements could not be used against him; consequently, we believe that any suspect in Lopez's situation would have viewed the two series of questions as part of one sequence.

The first and second factors of the plurality's test also support our finding that the warning was ineffective. While the exact questions did not overlap, the post-*Miranda* question resulted from the knowledge gleaned during the initial questioning – that Lopez had driven from Mexico to Kentucky (*i.e.* from a country serving as a cocaine conduit to a state where no cocaine is produced), via pickup truck, during the preceding week. That is, the question regarding the transportation of cocaine was not anomalous, which might support a finding that the warning was effective, but was the next logical question based on the earlier statements. All five factors – and particularly factors three, four and five – demonstrate that the *Miranda* warning was ineffective. As a result, Lopez's admission must be suppressed under *Seibert*'s effectiveness test.

Our dissenting colleague suggests that Lopez's decision to stop talking after his confession revealed that the warning was effective: "by invoking his right to silence" the defendant conveyed

---

[11] Because the Supreme Court divided 4-1-4 in *Seibert*, there has been some confusion about whether the plurality or concurring opinion controls. Most circuits have assumed that Justice Kennedy's concurrence operates as the controlling precedent, though others have raised doubts about whether his concurrence actually represents the narrowest grounds for decision. *See United States v. Carrizales-Toledo*, 454 F.3d 1142, 1151 (10th Cir. 2006) (describing the problem with adopting Justice Kennedy's approach); *United States v. Rodriguez-Preciado*, 399 F.3d 1118, 1139-42 (9th Cir. 2005) (Berzon, J., dissenting) (describing how a court should not adopt Justice Kennedy's opinion and might instead choose to apply the plurality's test). We do not need to resolve this issue because regardless of the applicable framework Lopez's statement must be suppressed.

his understanding of his *Miranda* rights in the "clearest, most unequivocal way possible." Dis. Op. at 2. As noted *supra*, the record is ambivalent as to whether the defendant specifically invoked his right to silence as an exercise of his *Miranda* rights or merely indicated that he did not want to speak further to investigators.[12] It is not difficult to imagine reasons for why Lopez ceased talking *after* he was taken to the bedroom, none of which relate to the effectiveness of the *Miranda* warning with regards to the earlier statement. Perhaps, as Officer LaGrange stated at the suppression hearing, Lopez stopped speaking because Bernal-Bajo "was giving him the look" and trying to intimidate him. JA 74. The facts of this case are distinguishable from the two cases – both of which discuss the issue of waiver and not effectiveness[13] – upon which the dissent relies for the proposition that the invocation of the right to silence necessarily indicates that the defendant understood those rights. *See United States v. Allen*, 247 F.3d 741, 766 (8th Cir. 2001); *Pickens v. Gibbons*, 206 F.3d 988, 995 (10th Cir. 2000). In finding a voluntary waiver, the Eight Circuit in *Allen* noted that the defendant "initiated the request to speak" with the officer, had been warned of his rights four times, and had specifically "indicated that he understood [his rights]" prior to confessing. *Id.* The case is hardly analogous to the present situation. In the instant case, Lopez received the warning only once and did not initiate any of the interactions with the investigators; moreover, the record is ambivalent as to whether he even understood those rights. The dissent's use of retrospection to find an effective warning is also directly contrary to the Supreme Court's admonition that courts should "presume that a defendant did not waive his rights [and that] the prosecution's burden is great" to demonstrate such a waiver. *North Carolina v. Butler*, 441 U.S. 369, 373 (1979). In *Pickens*, the Tenth Circuit emphasized that the defendant had, *prior to his confession*, demonstrated that he understood his rights: "[the defendant's] initial refusal to make a statement and his request for an attorney indicate he understood . . . both the nature and consequences of his right to remain silent and his right to counsel." *Pickens*, 206 F.3d at 996 (internal quotations omitted). In the instant case, Lopez's confession occurred *before* the interaction in which the defendant purportedly indicated his understanding of his rights.

Equally important, looking at the defendant's decision to stop speaking (which he conveyed in the bedroom rather than the kitchen – *i.e.* under different circumstances) presents an issue that is not before us. That is, the thrust of the effectiveness inquiry focuses on whether the defendant had a choice "at [the] juncture" of the statement, *Seibert*, 542 U.S. at 611-12, not on whether the defendant's later behavior casts retrospective insight into his state of mind at the time of the statement. Had Lopez confessed in the bedroom or specifically invoked his right to silence after further explanation by police, then perhaps the effectiveness issue would be a slightly closer call. *See id.* at 615 ("In *Elstad*, it was not unreasonable to see the occasion for questioning at the station house as presenting a markedly different experience . . . [and] the *Miranda* warnings could have made sense as presenting a genuine choice whether to follow up on the earlier admission."). But in this case, the *Miranda* warning was given literally in the middle of questioning, a situation that is "likely to mislead and 'deprive a defendant of knowledge essential to his ability to understand the nature of his rights and the consequences of abandoning them.'" *Id.* at 613-14 (quoting *Moran v. Burbine*, 475 U.S. 412, 424 (1986)). To hold otherwise elevates form over substance by treating "two spates of integrated and proximately conducted questioning as independent interrogations subject to independent evaluation simply because *Miranda* warnings formally punctuate them in the middle." *Id.* at 614. Additionally, adopting the dissent's position risks undermining important

---

[12] Officer Slaughter, whose testimony the district court found most reliable, stated simply that "Mr. Lopez stated that he did not wish to say anything to investigators" and that he "basically said he didn't want to say anything." JA 60-61. Testimony by Officer LaGrange, on the other hand, indicated that the "basic was he [Lopez] just said, no, he wanted to consult with an attorney." JA 74.

[13] As discussed *supra*, the *Seibert* plurality explained that where a warning is ineffective, the defendant cannot waive his rights. Hence, the issue of voluntariness does not arise. *See* 542 U.S. at 612 (describing how voluntariness issues are only addressed where the warning was effective).

constitutional rights through retrospective inferences, a result the Supreme Court has previously rejected in the context of *Miranda*. *Cf. Smith v. Illinois*, 469 U.S. 91, 98 (1984).

Lopez's statement must similarly be suppressed under the Supreme Court's earlier opinion in *Oregon v. Elstad*.[14] As the dissenting justices in *Seibert* explained, *Elstad* requires that "if [a suspect's] first statement is shown to have been involuntary, the court must examine *whether the taint dissipated through the passing of time or a change in circumstances*." *Seibert* 542 U.S. at 665 (citing *Elstad*, 470 U.S. at 310) (emphasis added). *Elstad* thus requires that "[w]hen a prior statement is actually coerced, the time that passes between confessions, the change in place of interrogations, and the change in identity of the interrogators all bear on whether that coercion has carried over into the second confession." *Elstad*, 470 U.S. at 310. When reviewing Lopez's confession, all three of these factors suggest a finding that the coercion has carried over. As discussed *supra*, there was no change in the time or place of the interrogation, or the identity of the interrogators. Further, when determining voluntariness, "the finder of fact must examine the surrounding circumstances and the entire course of police conduct with respect to the suspect in evaluating the voluntariness of his statements." *Id.* at 318. Here, there is insufficient evidence in the record that Lopez was aware that his earlier confession would not be admissible against him, nor do the circumstances suggest that the second confession was separate from the first confession in any way.[15]

Accordingly, Lopez's post-*Miranda* statements must be suppressed.

## IV.

For the foregoing reasons, the district court's opinion is REVERSED, and the defendant's motion to suppress GRANTED.

---

[14] The four dissenting justices in *Seibert* continued to adhere to the *Oregon v. Elstad* analysis. In addition, Justice Kennedy wrote in *Seibert* that any statement resulting from a deliberate two-step process aimed at evading *Miranda* must be suppressed. *Seibert*, 542 U.S. at 622 (Kennedy, J. concurring). In all other situations, "[t]he admissibility of postwarning statements should continue to be governed by the principles of *Elstad*." *Id.* Here, we assume *arguendo* that the government did not deliberately seek to evade *Miranda*, and that *Elstad* would thus control under Justice Kennedy's concurrence.

[15] The Supreme Court has clearly distinguished between (1) effectively "giving the warnings and [2] getting a waiver." *Seibert*, 542 U.S. at 608-09. The two are not the same. We pretermit the issue regarding the application of the standards for "getting a waiver" of the Fifth and Sixth Amendment rights protected by *Miranda*.

The Supreme court has set a high standard of proof for the waiver of constitutional rights, a standard requiring that courts should "'indulge every reasonable presumption against waiver' of fundamental constitutional rights. *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938). "Doubts must be resolved in favor of protecting the constitutional claim." *Michigan v. Jackson*, 475 U.S. 625, 633 (1986). Where "the interrogation continues without the presence of an attorney and a statement is taken, a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel." *Miranda*, 384 U.S. at 475.

---
**DISSENT**
---

GRIFFIN, Circuit Judge, dissenting. I concur in the result of the majority's ruling that two of defendant Pacheco-Lopez's initial statements, made before he received *Miranda* warnings, should be suppressed. I agree with the majority that defendant's statements of when he arrived at the house and how he got there were the products of custodial interrogation and not subject to the "booking exception."[1] However, in evaluating the booking exception, I do not join the majority's focus and obiter dictum regarding the heightened importance of a stationhouse location and recordation. In this regard, I reiterate that the booking exception applies if, under the totality of the circumstances, the questions and/or police activities are "normally attendant to arrest and custody" and are not "reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980).

I respectfully dissent from the majority's de novo fact-finding and suppression of Pacheco-Lopez's second group of statements. Regarding this "*Miranda*-in-the-middle" issue, the majority misapplies, both legally and factually, *Missouri v. Seibert*, 542 U.S. 600 (2004) and *Oregon v. Elstad*, 470 U.S. 298 (1985). First, regarding the legal standard, because there was not an opinion of the Court in *Missouri v. Seibert*, and five Justices did not agree on a rationale, "the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds . . . ." *Marks v. United States*, 430 U.S. 188, 193 (1977) (quoting *Gregg v. Georgia*, 428 U.S. 153, 169 n.15 (1976) (opinion by Stewart, Powell, and Stevens, JJ.)).

Applying the *Marks* "narrowest grounds" rule, I would hold that *Seibert* does not overrule *Elstad*, but creates an exception to it for cases in which the police intend to evade the safeguards of *Miranda* by deliberately employing a two-step strategy. Our sister circuits have so held. *See United States v. Carter*, 489 F.3d 528, 535-36 (2d Cir. 2007); *United States v. Street*, 472 F.3d 1298, 1312-13 (11th Cir. 2006); *United States v. Courtney*, 463 F.3d 333, 338 (5th Cir. 2006); *United States v. Williams*, 435 F.3d 1148, 1157 (9th Cir. 2006); *United States v. Kiam*, 432 F.3d 524, 531-33 (3d Cir. 2006); and *United States v. Stewart*, 388 F.3d 1079, 1090 (7th Cir. 2004). Indeed, Justice Kennedy, who concurred in the judgment, only, in *Missouri v. Seibert*, and provided the fifth vote for reversal, would continue to apply the voluntariness test of *Oregon v. Elstad* absent this showing. *Seibert*, 542 U.S. at 620 ("[t]he admissibility of postwarning statements should continue to be governed by the principles of *Elstad* unless the deliberate two-step strategy was employed.") (Kennedy, J., concurring).

As the Seventh Circuit stated in *Stewart*, 388 F.3d at 1090:

> In Justice Kennedy's view, however, an inquiry into change in time and circumstances between the prewarning and postwarning statements – what he called "curative steps" – is necessary only in cases involving the deliberate use of a two-step interrogation strategy calculated to evade the requirements of *Miranda*. Justice Kennedy thus provided a fifth vote to depart from *Elstad*, but only where the police set out deliberately to withhold *Miranda* warnings until after a confession has been secured. Where the initial violation of *Miranda* was not part of a deliberate strategy to undermine the warnings, *Elstad* appears to have survived *Seibert*.

---

[1] In my view, defendant's responses to the first two questions asking him for his name and address ("where they lived") are covered by the "booking exception." *See Pennsylvania v. Muniz*, 496 U.S. 582, 601 (opinion by Brennan, J.) (1990). To the extent that the majority rules otherwise, I respectfully dissent.

In the present case, the district court did not make factual findings regarding the voluntariness of defendant's pre- and post-*Miranda* statements pursuant to *Elstad*, and similarly failed to rule whether the police intended to evade *Miranda* by deliberately employing a two-step strategy, and, if so, whether defendant's *Miranda* warnings were effective. Because the record on appeal is inadequate, I would remand for a hearing and findings on these disputed issues of material fact. *See Williams*, 435 F.3d at 1161-62; *Stewart*, 388 F.3d at 1091-92. *See also Elstad*, 470 U.S. at 318; *United States v. Tyler,* 164 F.3d 150, 158 (3d Cir. 1998); and *United States v. McCurdy*, 40 F.3d 1111, 1118 (10th Cir. 1994).

Regarding the law, the majority clearly errs by applying the *Seibert* (plurality opinion) "effectiveness" factors in the absence of a factual finding that the police deliberately attempted to evade the safeguards of *Miranda*. Without this limitation set forth in Justice Kennedy's concurrence, Justice Souter's plurality opinion is nothing more than the views of four Justices. Thus, by itself, the *Seibert* plurality opinion is not precedentially binding. All of our sister circuits that have addressed this issue agree. Nonetheless, the majority applies Justice Souter's opinion as if it were precedent without the restriction of Justice Kennedy's concurrence. Moreover, the majority has impermissively engaged in de novo factfinding, which is normally the province of the trial court.

Finally, the majority refuses to acknowledge that the present case is factually distinguishable from both *Oregon v. Elstad* and *Missouri v. Seibert*. *Elstad* and *Seibert* were cases in which the defendants revealed inculpatory evidence as a result of a custodial interrogation conducted before the administering of their *Miranda* rights. In both cases, the defendants subsequently reiterated the earlier information after receiving *Miranda* warnings. However, in neither case did the defendant invoke his right to remain silent. In such instances, it is obviously difficult to determine whether the accused made an informed choice to confess or whether he believed his second confession was a continuation of the earlier, improper interrogation. Here, unlike Patrice Seibert or Michael Elstad, defendant Pacheco-Lopez exercised his right to silence *after* receiving *Miranda* rights. The plurality opinion in *Seibert* sets forth factors to be evaluated by the trial courts when the factual question of the effectiveness of the "*Miranda*-in-the-middle" warnings is in doubt. The ultimate objective is to determine whether the *Miranda* warnings were, in fact, effective. As Justice Souter stated:

> The threshold issue when interrogators question first and warn later is thus whether it would be reasonable to find that in these circumstances the warnings could function "effectively" as *Miranda* requires. Could the warnings effectively advise the suspect that he had a real choice about giving an admissible statement at that juncture? Could they reasonably convey that he could choose to stop talking even if he had talked earlier?

*Seibert*, 542 U.S. at 611-12.

In the present case, the answer to the above questions appears to be "yes." The majority contends that the record is unclear regarding whether Pacheco-Lopez invoked his right to silence or merely stated that he did not wish to speak to police further. However, the Supreme Court has directed that invocations of *Miranda* rights be interpreted broadly, and that upon a defendant's assertion of the right to remain silent "in any manner" questioning must immediately cease. *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). Therefore, in the present case, it appears unnecessary to conduct a searching review of the circumstantial evidence to determine whether the warnings were effective to Pacheco-Lopez.[2] Indeed, by invoking his right to silence, defendant Pacheco-Lopez conveyed this understanding in the clearest, most unequivocal way possible that he

---

[2]At a minimum, the trial court should make findings on these factual issues before our review on appeal.

understood his right to do so. *See United States v. Allen*, 247 F.3d 741, 766 (8th Cir. 2001) (noting that defendant's invocation of his right to counsel is "strong evidence" that defendant understood his rights), *vacated on other grounds by* 536 U.S. 953 (2002); *see also Pickens v. Gibson*, 206 F.3d 988, 995 (10th Cir. 2000) (citing *Cooks v. Ward*, 165 F.3d 1288-89 (10th Cir. 1998)) (noting that invocation of a *Miranda* right demonstrates a defendant's understanding of that right).[3] In light of his invocation of his right to remain silent, suppression of Pacheco-Lopez's post-*Miranda* statements can only arise from a perfunctory application of ill-fitting caselaw without regard to the factual realities of this case.

The majority argues that "the thrust of the effectiveness inquiry focuses on whether the defendant had a choice "'at [the] juncture' of the statement, not whether the defendant's later behaviors cast retrospective insight into his state of mind at the time of the statement." This statement underscores the majority's misunderstanding of how, on its facts, this case differs critically from *Seibert* and *Elstad*. The very purpose of analyzing the *Seibert* factors is to marshal circumstantial evidence, such as: location of the questioning; the time elapsed between warnings; and change in questioners, in order to ascertain whether the defendant, or a hypothetical reasonable proxy, would be able to make an informed choice regarding his right to remain silent. Under this approach, we attempt to approximate what the defendant *could* understand only because we typically do not know what the defendant *did* understand. The present case, however, offers that rare window into a defendant's mind that allows us to answer this latter question. Apparently, the warning was effective because Pacheco-Lopez invoked his right to silence. Thus, there appears to be no reason to substitute circumstantial assumptions for this direct evidence.

My colleagues might have a plausible argument had Pacheco-Lopez *never* invoked his right to silence. Similarly, if defendant had received a second *Miranda* warning after his post-*Miranda* inculpatory statements and *then* invoked his right to silence, a question might arise whether Pacheco-Lopez understood his rights when he made the statements admitting his guilty conduct. But when, as here, there was a single *Miranda* warning, and the defendant invoked his right to remain silent after this warning, the most reasonable inference is that defendant understood his right to remain silent.

For these reasons, I respectfully dissent. I would vacate the district court's order and remand to the trial court for a new suppression hearing and factual findings essential for our informed resolution of the *Elstad* and *Seibert* issues. I would not assume the role of factfinder but defer to the trial court's superior abilities in this regard.

---

[3] The majority asserts that these cases are inapposite because they decided the question of whether the defendant waived his right to remain silent. However, in order to validly waive one's right to silence, one must first understand that right. *Sanchez-Llamas v. Oregon*, 548 U.S. 331 (noting that "a defendant's waiver of his *Miranda* rights must be voluntary, knowing, and intelligent, i.e., 'the product of a free and deliberate choice . . . made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.'") (Ginsburg, J., concurring) (quoting *Moran v. Burbine*, 475 U.S. 412, 421 (1986)). Accordingly, while these cases address the larger issue of waiver, these holdings are applicable regarding the subsumed issue of what constitutes evidence of understanding of one's *Miranda* rights.