RENDERED: FEBRUARY 24, 2022
TO BE PUBLISHED

# Supreme Court of Kentucky

2021-SC-0009-MR

DEVERIOUS JONES                                                          APPELLANT

V.
ON APPEAL FROM FAYETTE CIRCUIT COURT
HONORABLE LUCY ANNE VANMETER, JUDGE
NO. 16-CR-01078-001

COMMONWEALTH OF KENTUCKY                                              APPELLEE

**OPINION OF THE COURT BY JUSTICE KELLER**

**<u>AFFIRMING</u>**

In this matter of right, Appellant, Deverious Dajewon Jones, appeals a Fayette Circuit Court judgment against him for a series of robberies, an assault, and a burglary. *See* KY. CONST. § 110(2)(b). Jones alleges the trial court erred by failing to provide him with conflict-free counsel and by admitting statements in violation of *Miranda v. Arizona*, 384 U.S. 436 (1966). For the reasons stated below, we affirm the judgment of the trial court.

## I.    BACKGROUND

Deverious Dajewon Jones, the Appellant, and his co-defendant, Tahjee Winters, were indicted for a string of robberies that occurred in Lexington between September 7, 2016 and September 17, 2016. Five separate incidents gave rise to Jones's indictment on thirteen counts of robbery in the first degree, one count of assault in the first degree, and one count of burglary in the first

degree. Because many of the details are not necessary to the resolution of the legal issues before us today, we only briefly describe each incident.

The first incident occurred on the night of September 7, 2016 at a residence at 712 Lucile Drive. Nakia Talbert and her boyfriend Byron Smith, as well as their two children, lived in the home. Two men with guns forced Talbert, Smith, and the two children into the home's master bedroom. The men searched the home and went through Smith's pockets. A third armed man also came into the home for a period of time. Apparently not finding what they were looking for, the men left, stealing Talbert's car as they departed. Talbert eventually identified Jones and Winters as two of the men who entered her home.

The second incident occurred at Hibbett Sports on Winchester Road on September 8, 2016. Two armed men forced Chase Mullins, an employee at Hibbett Sports, to open the cash register and give them the money inside the register. Mullins identified Jones as one of the men.

The third incident occurred at Hibbett Sports on Richmond Road on September 13, 2016. Three men entered the store and shopped for a short time before drawing guns and demanding money from the register. Two employees, James Blackburn and Cameron Montgomery, along with one customer, Medra Vanzayn, were forced into the stockroom and made to lie face down on the ground. Vanzayn was also robbed at gunpoint. Two additional customers, Katie Campbell and Eddie Franklin, entered the store while Blackburn, Montgomery, Vanzayn, and the three men were in the stockroom. The three men then left the

2

stock room and forced Campbell to give them her purse and forced Franklin to give them everything in his pockets. The men then left the store. Montgomery and Campbell both identified Jones as one of the armed men in the store. Blackburn was initially unsure but, in a follow up interview, stated Jones looked like one of the men.

The fourth incident occurred at a Shell gas station on September 17, 2016. Two men walked into the gas station and pulled guns on the gas station employee, Cody Hoban. They took all of the money out of the register. Hoban was not able to identify either of the men.

The final incident occurred at a Marathon gas station just a short time after the Shell gas station incident. Three employees, Seth Atkerson, Heather Dickenson, and Charles Moore, were in the store at that time, but only Dickenson and Moore were on-duty. Two armed men entered the store, and one of them pointed a gun at Moore's head, demanding money. The man eventually shot Moore multiple times, paralyzing him from the waist down and causing other significant health issues. None of the employees could identify the two men, although they were wearing similar clothes and driving a similar car as the two men from the Shell gas station incident.

Jones was arrested on September 22, 2016. At the time of his arrest, he was wearing clothing similar to those worn by one of the suspects from the gas station incidents. He was in possession of a gun which was later determined to have fired bullets at the Marathon. Winters was not arrested until September

26, 2016. He was arrested in Bowling Green after police received information that he was returning to his home state of Mississippi.

Jones and Winters were indicted by a Fayette County grand jury as co-defendants. At a jury trial, Jones was found guilty of one count of complicity to assault in the first degree, one count of burglary in the first degree, six counts of robbery in the first degree, three counts of complicity to robbery in the first degree, and four counts of principal or complicitor to robbery in the first degree. He was sentenced to twenty-four years' imprisonment. He appeals his conviction on the grounds that he did not have conflict-free representation and that his *Miranda* rights were violated. We consider each argument in turn.

## II.   ANALYSIS

### A. Successive Representation Conflict

Jones first claims error due to an alleged conflict of interest in his representation. Jones's attorney realized, in the middle of trial, that one of the victim witnesses called to testify against Jones was the attorney's former client. Jones's attorney represented the witness, Smith, ten years prior in an unrelated matter. Smith was the Commonwealth's witness and a victim from the home invasion burglary and robbery. Upon discovering the potential for a conflict of interest, Jones's attorney approached the bench and sought advice. He ultimately called the Ethics Hotline, a call center responsible for counselling attorneys with issues regarding professional responsibility, which counseled him not to cross-examine the witness. As a result, the Commonwealth offered to withdraw the witness entirely so as not to prejudice Jones and proceed with

4

other witnesses. Jones's attorney agreed to the solution, and Smith never testified.

On appeal, Jones claims that the successive representation prejudiced him. Specifically, he alleges that if his attorney was able to cross-examine Smith zealously, Smith may have divulged some exculpatory evidence and weakened the Commonwealth's case against him. Jones also argues that even if Smith had been able to testify, Jones still would have been prejudiced by his attorney sacrificing zeal in order to keep Smith's confidentiality. In a final alternative, Jones argues that even if Smith had testified and Jones's attorney had cross-examined him zealously, the attorney would have had to breach Smith's confidentiality, violating his professional duty to a former client.

We review successive conflicts of interest under the *Strickland* standard. *Strickland v. Washington*, 466 U.S. 668 (1984); *see also, e.g., Steward v. Commonwealth*, 397 S.W.3d 881, 883 (Ky. 2012). If there is error, because it was unpreserved, we must determine if the error is palpable.[1] Palpable error must be both obvious and serious. *Brock v. Commonwealth*, 947 S.W.2d 24, 28 (Ky. 1997). The error must be so severe as to "seriously affect the fairness, integrity or public reputation of the judicial proceedings." *Id.* (citation omitted).

---

[1] Jones argues as a threshold matter that conflicts resulting from successive representation are structural errors (defects "affecting the entire framework of the trial," necessarily rendering a trial "fundamentally unfair"). *McCleery v. Commonwealth*, 410 S.W.3d 597, 604 (Ky. 2013) (citation omitted). We decline to consider successive representation to be categorically a structural error, especially where the presence of an actual conflict is contested, and therefore will not review it as such. *See Commonwealth v. Douglas*, 553 S.W.3d 795, 800 (Ky. 2018).

Palpable error is therefore a higher standard than mere reversible error, since palpable error must result in "manifest injustice." *Id.*

To determine whether manifest injustice was wrought upon Jones's trial, we must first decide whether a conflict existed. If there is no conflict, then there is no error. Joint or concurrent representation amounts to a conflict and is impermissible (subject to some exceptions). SCR 3.130(1.7). Successive representation by contrast is less of a threat to the integrity of an attorney-client relationship, since an attorney's duties to former clients differ from those to current clients. *See Steward*, 397 S.W.3d at 883 n.3. For this reason, successive representation does not carry a presumption of prejudice. *Mickens v. Taylor*, 122 S.Ct. 1237, 1246 (2002). Under SCR 3.130(1.9)(a),

> A lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client gives informed consent, confirmed in writing.

On the terms of this rule, we do not need to reach the Sixth Amendment question and *Strickland* analysis. In this case, the matters were not substantially related, as noted in SCR 3.130(1.9)(a). Jones was being represented for multiple robberies. Smith, by contrast, was represented in a drug trafficking case a decade before the events occurred for which Jones was charged. Furthermore, because the Commonwealth withdrew its witness, there was no opportunity for information gained from the prior client to affect representation of the current client. Even if there would have been overlap in the subject of the matters, any chance of that overlap affecting Jones's

6

representation dissipated with the Commonwealth's decision not to call the witness. Because the matters were not substantially related, and because the Commonwealth's solution was effective in nullifying any risk of conflict, there is no error.

Jones also argues that he did not waive his right to conflict-free counsel as required by statute. However, since we hold that no conflict exists, such a waiver was ultimately unnecessary. We therefore also find no error on this argument.

## B. Pre-*Miranda* Statements

Jones next argues that his *Miranda* rights were violated by impermissible questioning prior to being Mirandized. Before trial, the trial court held a hearing to determine whether the answers taken from the interaction should be suppressed. The trial court ruled that nothing from the interaction would be suppressed. As a result, some of the information elicited at arrest, taken before Jones was Mirandized, was testified to at trial by one of the detectives responsible for his questioning. We review the factual findings of a trial court's ruling on a motion to suppress for clear error, and its conclusions of law de novo. *Moberly v. Commonwealth*, 551 S.W.3d 26, 29 (Ky. 2018). Because the principal issue from the suppression hearing was whether the questions could be classified as routine booking questions—a conclusion of law—we proceed with a de novo review of the trial court's decision not to suppress.[2]

---

[2] The trial court made no explicit factual findings regarding the officers' intent behind asking these questions beyond finding that the officers were merely "chatting" with Jones.

7

The questions asked of Jones, taken in a vacuum, seem innocuous. The trial court described the interaction as "chatt[y]." At the beginning of the interaction, Detectives Carroll and Carter first talked about the weather. Routine booking questions—name, age, address, etc.—soon followed. The officers then asked Jones a series of questions, including:

- How long he'd lived in Lexington,

- What brought him to Lexington,

- How he came to be employed,

- What the nature of his employment was,

- Whether he had ever attended a University of Kentucky (UK) football game,

- Whether he had worked at the UK football game the past weekend,

- How long he had worked since being in Lexington,

- What shifts he worked,

- Why he had a passcode on his phone,

- Why he had a gun, and

- Whether he'd lived in Mississippi his whole life.

Jones answered each question in turn. At the end of the above questions, Jones requested his attorney. Upon his request, he was Mirandized.

At trial, Detective Carter testified to the interaction. He testified to Jones's answers to several of the questions asked of Jones at booking, including:

- That he was originally from Yazoo City, Mississippi,

8

- That he had been in Lexington for a year and three months,

- That he came for job opportunities with others from Yazoo City,

- That he had worked various jobs since being in Lexington, including working in the University of Kentucky football stadium,

- That he had a passcode on his phone to keep his girlfriends from looking into his messages,

- That he had a gun for protection, and that he had gotten it from an individual rather than a store,

- That he did not work on the day of two of the crimes, and

- That he had lived in various places in Lexington before arriving at his current address.

### 1. *The Booking Exception to* Miranda

Under *Miranda*, a person in custody must be informed of their rights before they are interrogated. 384 U.S. at 498–99. "[T]he term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980).

Law enforcement enjoys a limited exception to *Miranda* in the context of booking and arrest. Questions that fall under the booking[3] exception to

---

[3] Although called the "booking" exception, this exception applies equally to questions asked at the time of arrest but before being formally "booked" into jail. Even

9

*Miranda* are those "reasonably related to the police's administrative concerns." *Pennsylvania v. Muniz*, 496 U.S. 582, 601–02 (1990). The aforementioned includes information whose usefulness is related to record-keeping, incarceration, and pre-trial services. *Dixon v. Commonwealth*, 149 S.W.3d 426, 432 (Ky. 2004). The United States Supreme Court "has been reluctant to circumscribe the authority of the police to conduct reasonable booking searches," giving officers some latitude when arresting and booking individuals accused of a crime. *Maryland v. King*, 569 U.S. 435, 456 (2013).

Not all questions incident to booking are protected from *Miranda*. *See Dunlap v. Commonwealth*, 435 S.W.3d 537, 598–99 (Ky. 2013) *abrogated on other grounds by Abbott, Inc. v. Guirguis*, 626 S.W.3d 475 (Ky. 2021). If the question is not "normally attendant to arrest and custody," or is not "reasonably related to the police's administrative concerns," then "it is not the sort of 'booking question' for which a *Miranda* exception has been created." *Id.* (citations omitted). However, when asking questions incident to booking such as a person's "name, address, height, weight, eye color, date of birth and current address," or employment status, police need not Mirandize a person in custody. *Id.* at 599 (citing *United States v. Pacheco-Lopez*, 531 F.3d 420, 423 (6th Cir. 2008)); *Dixon*, 149 S.W.3d at 432.

In *Dixon*, this Court held that the trial court did not err by admitting the defendant's responses to a question about employment status asked at

this finding is a mixed finding of fact and law, given the unique status of booking questions with reference to *Miranda* rights.

booking. 149 S.W.3d at 431. There, the trial court found that the employment question was not intended to incriminate but was instead part of routine intake questions on a form used by the officers. *Id.* at 433. On appeal, this Court held that given the lack of intent to incriminate, the questions did not run afoul of the United States Supreme Court's holding in *Muniz*, even though Dixon had asserted his right to counsel before the booking began. *Id.* at 431–32.

There are, therefore, two kinds of questions that may result from a booking interaction: questions "normally attendant to arrest and custody" (including questions "reasonably related to the police's administrative concerns"), and interrogations. Although some questions will fall neatly into either category, others may require a case-by-case analysis to determine whether or not they are appropriate under *Miranda* and *Muniz*. In the matter herein, some questions may have had the effect of incriminating Jones, while others were relatively innocuous. We must therefore determine which questions, if any, violated Jones's *Miranda* rights.

### 2. Jones's Routine Booking Questions

As stated above, standard booking questions (such as height, age, name, and date of birth) are always permissible under *Muniz*, even if they may be incriminating in effect. For example, height is a permissible booking question even if witnesses to a crime cite the criminal as being a specific or unusual height. Likewise, asking for a phone number is a standard and appropriate booking question, even if law enforcement has access to incriminating messages that include that phone number as a sender. Routine booking

11

questions asked of Jones include, for example, his name, weight, date of birth, phone number, former residences, employment status, and current address.

For this reason, although Jones argues that questions about his home state of Mississippi were improper, we hold that they were not. Booking questions involving past residences are clearly attendant to administrative needs, and can be utilized for a variety of purposes, including to conduct warrant searches, to establish community ties, and to determine potential necessities prior to trial (if a defendant is indigent, unhoused, or has no local connections on whom to rely). The detectives' questions about Jones's origin and current address are therefore booking questions, even though they may have had the tendency to show a connection with his co-defendant.

As noted, determining whether a question is reasonably related to the police's administrative concerns, versus whether it is an interrogation seeking incriminating evidence, sometimes requires a case-by-case determination. Whether an officer should know that a line of questioning is incriminating and not reasonably related to booking will change depending upon the alleged crime and the extent of an officer's knowledge regarding said crime. For example, if an officer booking an inmate is unaware that an element of the crime occurred last Saturday, then it might not be a violation of *Miranda* for the officer to attempt to develop rapport at booking by asking if he saw the big game that day, *even though* the information in the response may be used by the Commonwealth later. On the other hand, if a booking officer knows that part of the crime occurred on Saturday during the big game, that same question

12

becomes an improper interrogation. With this in mind, we look to the remaining questions asked of Jones during his booking.

Other appropriate booking questions asked of Jones were not necessary to his arrest, but were nonetheless not intended to incriminate him and were reasonably related to the administration of booking. For example, in this case, weather was not related to the crime nor Jones's arrest. Questions Jones was asked about weather were therefore proper. Questions about how long he had been employed, what brought him to Kentucky, and comparisons between Mississippi and Kentucky were similarly appropriate. Each of these questions, although perhaps nonessential to the process of booking, were reasonably related to other questions and administrative concerns in this case such that they fell under the exception to *Miranda*.

### 3. *Jones's Non-Booking Questions*

The officers did cross a line, however, when they asked Jones if he had worked on the day of two of the crimes, why he had a phone password, and why he had a gun. We address each impermissible question in turn.

The detectives arresting Jones were leading the investigation on the series of robberies for which he was accused. They likely knew the dates and times of those crimes, given that it was established at the suppression hearing that the officers arresting Jones were leading the investigations into the crimes. They therefore knew that if Jones had been working on the date they had asked about, he would have been unable to commit the crimes. Conversely, if he had not been working, it would be less likely that he had an alibi. The

13

detectives used Jones's answer—that he did not work that Saturday—in testimony at trial. Clearly, the detectives knew or should have known that his response could be incriminating. As such, Jones's answer did not fall under the booking exception to *Miranda.*

Similarly, asking Jones *why* he had a firearm did not reasonably relate to administrative concerns, and could easily have incriminated Jones further. Therefore, Jones's answer also did not fall under the booking exception to *Miranda.*

As for the question regarding his passcode, however, we have insufficient factual findings to establish that officers *intended* for this question to incriminate. Asking Jones for his phone number and requesting he turn over his phone and any weapons are certainly necessary elements of booking a defendant. However, asking *why* Jones had a passcode on his phone was similarly not reasonably related to administrative concerns. This question, too, may have been intended to incriminate. However, we have insufficient factual findings regarding the issue to determine if the trial court's failure to suppress was in error. Even if we assume, however, that this testimony should have also been suppressed by the trial court, for the reasons stated below, any error was harmless beyond a reasonable doubt.

In summary, the trial court erred in finding that all of Jones's statements fell under an exception to *Miranda.* Specifically, the trial court should have suppressed Jones's responses to questions regarding whether he worked the weekend of two of the crimes and why he owned a gun. Finding error, we must

14

determine if the error is harmless beyond a reasonable doubt. *See Winstead v. Commonwealth*, 283 S.W.3d 678, 689 n.1 (Ky. 2009) (citing *Chapman v. California*, 386 U.S. 18, 24 (1967)); RCr 9.24. "Thus, we ask whether 'absent [the impermissible testimony], is it clear beyond a reasonable doubt that the jury would have returned a verdict of guilty?'" *Baumia v. Commonwealth*, 402 S.W.3d 530, 539 (Ky. 2013) (quoting *United States v. Hasting*, 461 U.S. 499, 510–11 (1983)).

At trial, multiple people, including several victims, testified regarding the robberies. Multiple people testified that Jones was the perpetrator, and identified him outright. A gun in his possession matched bullets at a crime scene. The gun also matched victims' descriptions. Jones himself matched the descriptions of the perpetrator, and was wearing similar clothes to those worn during some of the crimes when he was apprehended. Finally, the Commonwealth introduced inculpatory text messages sent by Jones and web searches conducted by Jones into evidence at trial. Overall, the evidence against him was such that even absent the statements at booking, it is "clear beyond a reasonable doubt" that Jones would have still been found guilty. This error was therefore harmless beyond a reasonable doubt.

### III. CONCLUSION

Because no conflict impaired his representation, and because any error in the trial court's failure to suppress was harmless beyond a reasonable doubt, we affirm the trial court's judgment.

Minton, C.J.; Conley, Hughes, Keller, Lambert & Nickell, JJ., sitting. All concur. VanMeter, J., not sitting.

COUNSEL FOR APPELLANT:

Kathleen Kallaher Schmidt
Erin Hoffman Yang
Department of Public Advocacy

COUNSEL FOR APPELLEE:

Daniel J. Cameron
Attorney General of Kentucky

Emily Bedelle Lucas
Assistant Attorney General

Kenneth Wayne Riggs
Assistant Attorney General

Christina Lauren Romano
Assistant Attorney General