**NOT FOR FULL-TEXT PUBLICATION**
File Name: 09a0431n.06

**Nos. 07-4230; 08-3778**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

<table>
<tr><td>

UNITED STATES OF AMERICA,

      Plaintiff-Appellee,

v.

GEORGE CLEMENTS,

      Defendant-Appellant.

_____/
</td><td>

**FILED**
**Jun 24, 2009**
LEONARD GREEN, Clerk

**ON APPEAL FROM THE
UNITED STATES DISTRICT
COURT FOR THE NORTHERN
DISTRICT OF OHIO**
</td></tr>
</table>

**BEFORE: MARTIN, SUHRHEINRICH and GIBBONS, Circuit Judges.**

**PER CURIAM.** Defendant George Clements appeals his jury conviction and sentence for being a felon in possession of firearms, and for possession with intent to distribute cocaine. On appeal, Clements asserts that there was insufficient evidence to support the jury verdict. He also claims that the district court erred in denying his motion to suppress, his motion for a mistrial, and his motion for a new trial. For the reasons that follow, we **AFFIRM**.

**I. Background**

On September 16, 2006, law enforcement officers executed a search warrant on a home ("Cleveland Home") in Cleveland, Ohio.[1] The search revealed firearms, ammunition, and powder cocaine. As a result, Clements was arrested by the Cleveland Police Department.

On October 16, 2006, a federal grand jury returned a two-count indictment against Clements

_____

[1]Pursuant to FED. R. CRIM. P. 49.1(a) and FED. R. APP. P. 25(a)(5), Clements redacted the address of the home at issue. For clarity, we refer to the home generically as "Cleveland Home."

for being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g) ("Count 1"), and possession with intent to distribute cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C) ("Count 2").

On January 12, 2007, Clements filed a motion to suppress evidence seized pursuant to the search warrant. On March 26, 2007, the district court denied Clements's motion to suppress without a hearing.

On June 26, 2007, a jury trial commenced. Clements filed two motions for acquittal pursuant to FED. R. CRIM. P. 29, one at the close of the Government's case and the second at the close of all the evidence. The district court denied both motions.

On June 28, 2007, the jury found Clements guilty as charged in the indictment. On September 17, 2007, the district court sentenced Clements to 41 months of incarceration, followed by 3 years of supervised release for Count 1 and 6 years of supervised released for Count 2, running concurrently.

Clements timely appeals to this Court. On March 12, 2008, while his appeal was pending, Clements filed a motion for a new trial or, alternatively, for an evidentiary hearing based upon newly discovered evidence. On May 28, 2008, the district court denied Clements's motion. Clements also timely appeals that denial. By order dated June 27, 2008, this Court consolidated both appeals.

## II. Analysis

### A. Sufficiency of Evidence

Clements first argues that the evidence submitted at trial was insufficient to support the jury's findings that Clements knowingly possessed a gun and cocaine at the home on September 16, 2006. At trial, the Government's witnesses provided the following testimony:

Lieutenant Michael Connelly of the Cleveland Police Department testified that on September 15, 2006, Cleveland Police Officers, a Cleveland Police SWAT Unit, and an officer from the Cuyahoga Metropolitan Housing Authority executed the search warrant on the Cleveland Home. Officers found Clements and his son at the home. Officers also found a .22 caliber rifle in a closet near the front door and a 9 mm pistol on top of a surveillance monitor. Ammunition was found throughout the home.

Lieutenant Connelly also testified that officers found a black leather coat by the front door. Inside the coat, officers found eight small bags of cocaine, keys fitting the front door, Clements's personal papers, and a 9 mm magazine. The personal papers included a receipt for a money order; an action card for the U.S. Postal Service; a bill for the action card; a receipt for Northeast Ohio Health Service for Clements listing the Cleveland Home address; an OnStar receipt for Clements addressed to the Cleveland Home; a receipt for "real estate" with Clements's name; and a receipt from the U.S. Postal Service. Lieutenant Connelly further testified that small, individually wrapped bags containing cocaine were found elsewhere in the home. He also stated that a scale was found with cocaine residue upon it.

Officer Edwin Cuadra of the Cleveland Police Department's Narcotics Unit testified that during the search, officers discovered what appeared to be a child's bedroom, an adult's bedroom in the northeast corner, and a storage room on the upstairs level. In the northeast bedroom, officers found $4,190 in cash on top of a dresser. Upon a search of the northeast bedroom closet, officers also found nine small bags of cocaine in a jacket pocket and marijuana inside another jacket. Officers also found a palm scale on a table top in the same northeast bedroom.

Officer Cuadra also found the following papers bearing Clements's name in the northeast

-3-

bedroom: a property tax bill, a vehicle registration, a water bill, a gas bill, and personal mail. Additionally, the vehicle registration, gas bill, pay stub, and personal mail showed the Cleveland Home address as Clements's mailing address.

Officer Matthew Baeppler, also of the Cleveland Police Department's Narcotics Unit, testified about Clements's responses during the booking process following Clements's arrest. Officer Baeppler testified that Clements told the booking officer that the Cleveland Home was his residence.

Special Agent Douglas Williams of the Federal Bureau of Investigation testified as an expert witness and shared his belief that cash, scales, materials used to cut and repackage large amounts of drugs into smaller amounts for resale, weapons, and security measures all constituted tools of the drug trade.

Linda Jones, a "ten print examiner" with the Cleveland Police Department's Crime Scene Unit, testified as to the results of her fingerprint processing on the items seized from the home. Jones stated that she found no latent fingerprints on the 9 mm handgun or the various rounds of ammunition. Jones testified that Linda Kimball, a co-worker, found a latent print on the .22 caliber rifle, but that print did not match Clements's. Jones did not test any other materials for fingerprints.

The Government also called Jessika Harris, the mother of Clements's son. Harris testified about dropping off their minor son to visit with Clements. Harris stated that ninety per cent of the time, she dropped off their son at the Cleveland Home; other times, she dropped their son off at the home of Clements's sister, Lorraine Clements. Harris also admitted that she did not know where Clements lived, and had no reason to know whether he lived anywhere other than the Cleveland Home. On the day the search warrant was executed, Harris dropped off their son at the home and

left him with Lastarza Hill, who lived at the Cleveland Home. Harris admitted that she usually left their son with Hill when she dropped him off for visits.

Clements presented two witnesses. First, Lorraine Clements, Clements's sister, testified that Clements moved out of the Cleveland Home in August 2006 and moved to a home on Chambers Avenue with his fiancée. Lorraine Clements testified that Clements's clothes were at the home on Chambers Avenue, Clements left for work from the Chambers Avenue home, and everyone knew Clements lived on Chambers Avenue, including his boss for W-2 form purposes. Lorraine Clements also testified that Lastarza Hill lived with Clements at the Cleveland Home for two years before Clements moved out and that Hill was still living there at the time of the search. Lorraine Clements further testified that the Cleveland Home was a family home used as a rental property and as a place for Clements to keep his dogs, and Hill took care of the dogs. Clements also allowed friends to stay at the Cleveland Home, and they would maintain the property and pay small sums of money in return.

Clements's second witness, Monique Lawson, testified that Clements was her fiancé and that Clements moved into her Chambers Avenue home in August 2006. She stated that Clements still had some belongings at the Cleveland Home. However, Lawson and Clements entered into a lease agreement on the Chambers Avenue home, which was evidenced by a defense exhibit. Lawson signed the lease, and both she and Clements were responsible for the rent payments. Lawson further testified that Lastarza Hill lived at the Cleveland Home for a few years and was the only person living at the home on the day of the search.

This Court gives de novo review to a district court's denial of a motion for judgment of acquittal pursuant to FED. R. CRIM. P. 29. *United States v. Grubbs*, 506 F.3d 434, 438 (6th Cir.

-5-

2007). In reviewing claims of insufficiency of evidence, this Court considers "'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *United States v. Humphrey*, 279 F.3d 372, 378 (6th Cir. 2002) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). "We do not weigh the evidence presented, consider the credibility of witnesses, or substitute our judgment for that of the jury." *United States v. Davis*, 177 F.3d 552, 558 (6th Cir. 1999). We will reverse a judgment based on insufficiency of the evidence "'only if [the] judgment is not supported by substantial and competent evidence upon the record as a whole.'" *United States v. Barnett*, 398 F.3d 516, 522 (6th Cir. 2005) (quoting *United States v. Stone*, 748 F.2d 361, 363 (6th Cir. 1984)). "'Circumstantial evidence alone is sufficient to sustain a conviction and such evidence need not remove every reasonable hypothesis except that of guilt.'" *United States v. Spearman*, 186 F.3d 743, 746 (6th Cir. 1999) (quoting *United States v. Vannerson*, 786 F.2d 221, 225 (6th Cir. 1986)).

### 1. Felon in Possession

The crime of being a felon in possession of a firearm has three elements: (1) the defendant had a previous felony conviction; (2) the defendant knowingly possessed the firearm specified in the indictment; and (3) the firearm traveled in or affected interstate commerce. *United States v. Kincaide*, 145 F.3d 771, 782 (6th Cir. 1998). Clements challenges the sufficiency of the evidence proving that he knowingly possessed the firearm.

Under 18 U.S.C. § 922(g)(1), a defendant may be convicted for either actual or constructive possession of a firearm. *Grubbs*, 506 F.3d at 439. Actual possession requires the defendant to knowingly have "immediate possession or control" of the object. *United States v. Craven*, 478 F.2d

1329, 1333 (6th Cir. 1973). "Constructive possession exists when a person does not have actual possession but instead knowingly has the power and the intention at a given time to exercise dominion and control over an object, either directly or through others." *Id.* "Presence *alone* near a gun . . . does not show the requisite knowledge, power, or intention to exercise control over the gun to prove constructive possession." *United States v. Arnold*, 486 F.3d 177, 183 (6th Cir. 2007) (internal quotations and citation omitted). Instead, "other incriminating evidence, coupled with presence" is required to "tip the scale in favor of sufficiency." *Id.* This Court has held, for example, that constructive possession may be proved when the defendant had "dominion over the premises where the firearm is located." *United States v. Gardner*, 488 F.3d 700, 713 (6th Cir. 2007) (internal quotations and citation omitted). Indeed, "[w]hen the defendant is found in close proximity to a firearm at the time of the arrest, the inference of dominion[2] and control is particularly strong, and thus the incriminating evidence needed to corroborate the conviction is less." *Grubbs*, 506 F.3d at 440.

Contrary to Clements's argument, we conclude that the record contains sufficient evidence from which a rational factfinder could have found beyond a reasonable doubt that Clements both knew of the firearm and had constructive possession of it. The Government presented evidence that Clements owned the Cleveland Home where the gun was found and that Jessika Harris dropped off

---

[2]Though our caselaw does not define "dominion," this Court recently noted that a consensus "has developed in federal and state courts 'that where the defendant is in nonexclusive possession of premises on which [illicit contraband] [is] found, it cannot be inferred that he knew of the presence of such [contraband] and had control of [it], unless there are other incriminating statements or circumstances tending to buttress such an inference.'" *United States v. Bailey*, 553 F.3d 940, 945, n.3 (6th Cir. 2009) (quoting Emile F. Short, Annotation, *Conviction of possession of illicit drugs found in premises of which defendant was in nonexclusive possession*, 56 A.L.R.3d 948, 1974 WL 35135, § 4 (1974)).

Clements's son at the home about ninety per cent of the time. Clements told the booking officer that the Cleveland Home was his residence. Clements's personal papers and mail were found in a bedroom and in the jacket hanging next to the front door. And Clements kept his dogs at the home and allowed friends to stay there. That evidence of Clements's dominion over the home, coupled with his proximity to the firearm, was sufficient for a rational factfinder to find that Clements knowingly possessed the firearm. *See Gardner*, 488 F.3d at 713.

### 2. Possession of Controlled Substance With Intent to Distribute

Clements also challenges the sufficiency of evidence supporting the knowledge and intent elements of the crime of possession of a controlled substance with intent to distribute under 21 U.S.C. § 841(a)(1). Clements contends that the evidence is insufficient because: (1) he was never seen using or distributing narcotics, (2) no one testified that he lived at the home at issue, (3) there was no evidence that the jacket containing cocaine belonged to Clements, (4) Clements did not have prerecorded "buy money" in his possession or inside the home, and (5) Clements did not have narcotics on his person when the warrant was executed.

The standard for possession under 21 U.S.C. § 841(a)(1) is the same as under 18 U.S.C. § 922(g), so we reference our summary of actual and constructive possession above. *See United States v. Hunter*, 558 F.3d 495, 503 (6th Cir. 2009). Just as Clements had constructive possession of the firearm, the record demonstrates Clements's ownership and use of the home, and ability to exercise dominion over the seized cocaine and other items, supports the jury's finding that he constructively possessed that contraband. Further, a rational factfinder could have inferred that Clements had the specific intent to distribute cocaine given that cocaine was found in small, individually wrapped bags inside a jacket that also contained Clements's personal papers. *See United States v. Dotson*, 871

F.2d 1318, 1323 (6th Cir. 1989) ("[A] jury reasonably may infer intent to distribute drugs from the manner in which the drugs are packaged, or from the possession of drug packaging paraphernalia."). That inference is strengthened by the discovery of a scale, a large amount of cash in a bedroom along with personal papers bearing Clements's name, and the presence of firearms. *See United States v. Hill*, 142 F.3d 305, 311 (6th Cir. 1998) (holding that intent to distribute could be inferred from the presence of "various items commonly used to conduct drug trafficking activity," including, *inter alia*, "large sums of U.S. currency"); *United States v. Rodriguez*, 882 F.2d 1059, 1063 (6th Cir. 1989) (finding an inference of intent to distribute cocaine based on evidence of "scales, commonly used to weigh drugs; cash, arguably obtained from drug transactions; and the handgun, which would be consistent with the protection and coercion common in transacting narcotics"). Therefore, a rational factfinder could have found that Clements knowingly possessed cocaine with intent to distribute beyond a reasonable doubt.

## B. Motion to Suppress

Clements next argues that the district court erred in denying his motion to suppress evidence seized from the home because the search warrant affidavit failed to establish a nexus between the home and the items sought. Detective James Cudo drafted the affidavit at issue. In the affidavit, Affiant Cudo stated that, within the past 72 hours, he had met a confidential reliable informant ("CRI"), whom Affiant Cudo considered reliable based upon his participation in several prior controlled purchases of narcotics, which led to the issuance of search warrants and drug-related arrests. The CRI informed Affiant Cudo that he had gone with an "identified black male" to the Cleveland Home. The black male went inside the home to purchase a multi-ounce quantity of cocaine and allegedly made the purchase. Detective Cudo stated that the CRI informed him that they

could arrange for a controlled purchase using the black male as "middleman."

Thereafter, Affiant Cudo and DEA Agent Lucas arranged a controlled purchase with the CRI. The CRI was searched, fitted with a recording device, and given recorded money. The CRI met the black male, who instructed the CRI to follow him in a separate car to the Cleveland Home. Affiant Cudo and Agent Lucas also followed. The black male instructed the CRI to park a distance away and wait while the black male entered the home and made the purchase. Affiant Cudo's unit maintained surveillance on the home. Affiant Cudo averred that his unit observed the black male go up the porch of the home, speak with several males on the front porch, enter the home, and leave a short time later. Affiant Cudo explained that the black male entered his car and drove to the CRI's vehicle, which was also under surveillance. Affiant Cudo did not indicate whether officers observed the black male give drugs to the CRI. However, he stated that the black male exited his vehicle, entered the CRI's vehicle, and exited a short time later, counting U.S. currency as he returned to his own vehicle. Affiant Cudo stated that he believed the identified black male had just purchased the multi-ounce quantity of cocaine from the Cleveland Home and resold it to the CRI.

Affiant Cudo further averred that after the sale, officers observed the identified black male drive back to the home, enter for a short time, and leave again. A member of Affiant Cudo's unit maintained surveillance on the home and observed a moderate amount of vehicle traffic, wherein people would arrive at the home, exit their cars, enter the home through the front door, stay a short period of time, then leave the area. Affiant Cudo stated that, in his experience, such activity is indicative of drug trafficking.

Clements argues that the affidavit, at best, establishes probable cause to search the identified black male, but fails to demonstrate probable cause to search the home. We review the district

court's factual findings on a motion to suppress for clear error and its legal conclusions de novo. *United States v. Martin*, 526 F.3d 926, 936 (6th Cir.), *cert. denied*, 129 S. Ct. 305 (2008). "A finding of probable cause is a legal conclusion that we also review de novo." *Id.* "A factual finding will only be clearly erroneous when, although there may be evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. Navarro-Camacho*, 186 F.3d 701, 705 (6th Cir. 1999). However, we view the evidence "in a light most likely to support the decision of the district court." *United States v. Frazier*, 423 F.3d 526, 531 (6th Cir. 2005).

Probable cause is described as a fair probability, though not an absolute certainty, that evidence of the crime will be found at the location. *Illinois v. Gates*, 462 U.S. 213, 238 (1983). We review the totality of the circumstances "to make a practical, commonsense," not hyper-technical, determination of whether probable cause is present. *Gates*, 462 U.S. at 238. "Under the totality of the circumstances approach, our task is to assess the adequacy of all the circumstances set forth in the affidavit, including the veracity and basis of knowledge of a confidential informant, as well as law enforcement's corroboration of the informant's tip." *Martin*, 526 F.3d at 936 (internal citations omitted). "The affidavit is judged on the adequacy of what it does contain, not on what it lacks, or on what a critic might say should have been added." *United States v. Allen*, 211 F.3d 970, 975 (6th Cir. 2000) (en banc).

Here, given the totality of the circumstances described in the affidavit, there was probable cause to search the home. The CRI told Affiant Cudo about a prior purchase, wherein the identified black male purchased cocaine from the Cleveland Home and sold it to the CRI. The CRI explained that he could arrange for another such purchase. Thereafter, during the subsequent controlled

purchase described in Affiant Cudo's affidavit, the identified black male was observed by officers entering the same home and subsequently selling cocaine to the CRI down the street from the home. And continued police surveillance of the home revealed a moderate amount of vehicle traffic at the home, with visitors staying only a short time, which, in Affiant Cudo's experience, indicated likely drug activity and further corroborated the CRI's statement that the cocaine was purchased at the home. Based upon the totality of the affidavit, there was "a fair probability that contraband or evidence of a crime will be found" at the home. *Gates*, 462 U.S. at 238.

### C. Motion for Mistrial

Clements's third argument is that his *Miranda* right to silence had been violated at trial and, as a result, the district court erred in denying his motion for a mistrial. On the second day of trial, Officer Matthew Baeppler testified about Clements's arrest and booking. Prior to hearing Officer Baeppler's testimony, the district court instructed the Government to "ask leading questions in this area so there is not even an opening that [Clements] was asked any questions, or he didn't answer, et cetera." On direct examination, the Government asked Officer Baeppler about Clements's responses during the booking process. In particular, the Government and Officer Baeppler had the following exchange:

Q.    Did you ask him his date of birth?

A.    Yes.

Q.    And what, if anything, did he tell you?

A.    Actually at that point he became belligerent and wouldn't answer anymore.

Clements immediately objected, and the district court sustained, instructing the jury, "Ladies and gentlemen, you will disregard that last remark." Counsel for Clements also asked for a mistrial

-12-

because the witness testified that Clements had refused to answer questions. The district court refused to declare a mistrial, finding that Clements's constitutional rights had not been violated by the witness's answer.

On appeal, Clements argues that Officer Baeppler's comment that Clements exercised his right to remain silent was prejudicial error because it allowed the jury to infer that Clements was hiding something, the evidence supporting his conviction was "certainly not overwhelming," and because the district court's curative instruction to "disregard that last comment" was insufficient to overcome the prejudice inflicted. According to Clements, improper comments about the exercise of his *Miranda* right to remain silent amount to an impermissible *Doyle* error and violate due process by permitting the prosecution to call attention to his silence despite being given the right not to speak. *See Doyle v. Ohio*, 426 U.S. 610, 619 (1976) (holding that a prosecutor's use of petitioner's post-arrest silence to impeach the petitioner's trial testimony violated the Due Process Clause). The Government counters, arguing that Officer Baeppler's testimony about Clements's refusal to give his date of birth was properly admitted because such routine "booking" questions do not reach the level of interrogation safeguarded by *Miranda*, and comments about refusing to answer routine biographical questions do not create prejudice or imply guilt.[3]

---

[3]The Government also asserts that during a sidebar conference at trial, Clements's attorney stated his belief that Clements was not *Mirandized* prior to being asked about his birth date. Clements rebuts the Government's assertion, citing the sworn testimony of Detective Cudo at Clements's December 11, 2006 detention hearing, wherein Detective Cudo stated, "After the initial conversing with him and myself advising him of his *Miranda* Rights and finding he was highly intoxicated and extremely belligerent towards officers, I did not question him as to anything." Regardless of whether Clements was *Mirandized* before being asked when he was born, the question clearly falls into the booking exception to *Miranda*, *United States v. Pacheco-Lopez*, 531 F.3d 420, 424 (6th Cir. 2008), so the distinction makes no difference here.

As a general rule, police must read *Miranda* warnings prior to interrogating a suspect in custody. *Miranda v. Arizona*, 384 U.S. 436 (1966). "Interrogation" in this context includes "not only [] express questioning, but also [] any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980). "*Miranda* warnings are not, however, required for questions 'reasonably related to the police's administrative concerns,' such as the defendant's name, address, height, weight, eye color, date of birth and current address." *United States v. Pacheco-Lopez*, 531 F.3d 420, 423 (6th Cir. 2008) (quoting *Pennsylvania v. Muniz*, 496 U.S. 582, 601 (1990)). This Court has cautioned that reviewing courts invoking the "booking exception" to *Miranda* must carefully scrutinize the facts because "[e]ven a relatively innocuous series of questions may, in light of the factual circumstances and the susceptibility of a particular suspect, be reasonably likely to elicit an incriminating response." *United States v. Avery*, 717 F.2d 1020, 1025 (6th Cir.1983).

The booking question about Clements's birth date does not implicate *Miranda* protections. *See Pacheco-Lopez*, 531 F.3d at 423. And Clements's refusal to answer did not create an inference of guilt because his answer–or refusal to answer–did not incriminate him for the crimes charged. Moreover, upon Clements's immediate objection, the district court issued a curative instruction to the jury to disregard the comment. A jury is presumed to follow the district court's curative instructions. *United States v. Moreno*, 933 F.2d 362, 368 (6th Cir. 1991). Clements therefore fails to demonstrate prejudicial error. *See United States v. Moore*, 917 F.2d 215, 220 (6th Cir. 1990) ("A defendant may move for a mistrial where there is a legitimate claim of seriously prejudicial error."). Accordingly, any potential constitutional error in admitting testimony that Clements refused to

provide his date of birth was harmless beyond a reasonable doubt, *see Chapman v. United States*, 386 U.S. 18, 24 (1967) (holding that a federal constitutional error is harmless only after a reviewing court satisfies itself that the error was harmless beyond a reasonable doubt), and we find no abuse of discretion in the district court's denial of a mistrial, *see United States v. Atisha*, 804 F.2d 920, 926 (6th Cir. 1986) ("Since granting a mistrial is generally within a trial court's discretion, . . . we must decide when a trial court has abused its discretion by failing to grant a mistrial.") (citations omitted).

### D. Motion for New Hearing

Clements's final argument is that the Government failed to disclose evidence regarding alleged misconduct by Special Agent Lee Lucas, which resulted in a violation of *Brady v. Maryland*, 373 U.S. 83 (1963), or alternatively was newly discovered evidence, warranting a new trial under FED. R. CRIM. P. 33. As Clements explains, after his trial, an informant in an unrelated 2007 case involving Special Agent Lee Lucas recanted his testimony, which prompted the Government to drop charges in many cases and further precipitated investigations into both the informant and Agent Lucas. Those investigations culminated in an 18-count indictment against Agent Lucas on May 12, 2009, charging him with wrongful conduct in connection with two criminal trials in the Northern District of Ohio. Clements asserts that though information about Agent Lucas came to public light after his trial, the Government was aware of Lucas's possible misconduct even before Clements was prosecuted.

The district court denied Clements's motion for a new trial, finding that evidence purporting to impeach Agent Lucas was immaterial in determining Clements's guilt. This Court reviews a district court's denial of a motion for new trial based on newly discovered evidence or *Brady* violations for abuse of discretion. *United States v. Jones*, 399 F.3d 640, 647 (6th Cir. 2005).

## 1. *Brady* Claim

In *Brady*, the Supreme Court held that the government violates the accused's due process rights in suppressing evidence favorable to the accused "where [such evidence] is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 88. A *Brady* violation has three components: "The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999).

Agent Lucas was involved in two stages of Clements's prosecution. First, Agent Lucas, along with Detective Cudo, coordinated and executed a controlled purchase of cocaine, which was chronicled by Detective Cudo in his affidavit supporting the search warrant executed on Clements's home. Second, Agent Lucas testified before the grand jury, which returned the two-count indictment against Clements.

### a. Search Warrant and Affidavit

As Clements explains, though Detective Cudo was the affiant, the affidavit supporting the search warrant references Agent Lucas, and if Detective Cudo knew of misconduct by Agent Lucas, then Detective Cudo submitted a reckless or fraudulent affidavit. Clements asserts that he would have used evidence of Agent Lucas's misconduct to successfully challenge the validity of the warrant in a *Franks* hearing. The Government argues that information about Agent Lucas was unavailable when the Government was obligated to make *Brady* disclosures in response to Clements's request for a *Franks* hearing. And even if that information was available, the Government argues it would not have been relevant or material in a *Franks* challenge because Detective Cudo was the affiant for

-16-

the warrant.

Under *Franks v. Delaware*, 438 U.S. 154 (1978), Clements is entitled to an evidentiary hearing to challenge the validity of a search warrant only if he "makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and . . . the allegedly false statement is necessary to the finding of probable cause." *Franks*, 438 U.S. at 155-56. If, when the statements which were allegedly made falsely or with reckless disregard for the truth are set to one side, "there remains sufficient content in the warrant affidavit to support a finding of probable cause, no hearing is required." *Id.* at 171-72.

Clements argues that Affiant Cudo may have known about purported misconduct by Agent Lucas, which would have resulted in a reckless or fraudulent affidavit. However, Clements does not point to a single statement in the affidavit that Affiant Cudo drafted recklessly or fraudulently. Clements also does not dispute that Affiant Cudo was present during the controlled purchase referenced in the affidavit and, as such, Affiant Cudo independently verified the information contained in the warrant. Further, the affidavit does not contain any statements made by Agent Lucas. Accordingly, any information allegedly impeaching Agent Lucas was immaterial for making the substantial preliminary showing for a *Franks* hearing and is, thereby, immaterial under *Brady*.

### b. Agent Lucas's Grand Jury Testimony

Clements also seeks a new hearing to determine whether the Government allowed Agent Lucas to testify before the grand jury even though the Government knew he had been falsely testifying in other trials. In support, Clements cites an alleged inconsistency between Agent Lucas's sworn grand jury testimony and a statement made by Affiant Cudo in his affidavit attached to the

Government's Surreply Brief opposing Clements's motion for a new trial.

Agent Lucas testified before the grand jury about the controlled purchase and execution of the search warrant, explaining that

> *we* did some research on this address, and *we* determined it was owned by . . . George Clements. So from that information that *we* had on September 14, 2006, *we* went and got a search warrant – Cuyahoga County search warrant, and on September 15th, the next day was a Friday, *we* ended up doing a search warrant at the residence. George Clements was sitting on the porch when *we* went up and did the search warrant.

However, in Detective Cudo's affidavit supporting the Government's Surreply Brief, Detective Cudo stated that Agent Lucas only participated in the controlled purchase:

> The Police Report fairly and accurately describes the facts and circumstances of the execution of an authorized search warrant at [the Cleveland Home]. . . . The [] Police Report . . . makes no mention of DEA Special Agent Lee Lucas as he was not present during the execution of search warrant at defendant's residence or defendant's arrest. Special Agent Lucas's involvement with the investigation of defendant's activities was limited to the team of officers and agents required to conduct the controlled purchase which served as the basis of the search warrant.

Clements argues that a new trial or evidentiary hearing is warranted to explore whether Agent Lucas meant to include himself as one of the officers executing the search warrant when using the pronoun "we." The Government contends that, as evidenced by the police report and Detective Cudo's sworn affidavit, Agent Lucas was not present during the execution of the search warrant. Further, because evidentiary rules are relaxed in grand jury proceedings, the Government explains that it customarily presents its entire case through the testimony of a single agent, just as happened here, who may include hearsay statements in his testimony about what actually occurred.

Clements does not argue that anything in the police report describing the execution of the search warrant and Clements's arrest was false. And as the district court found, the police report

-18-

contains no mention of Agent Lucas as being present during the execution of the warrant. Accordingly, we hold that the district court did not abuse its discretion in denying a new trial or evidentiary hearing to clear up whether Agent Lucas meant to imply he was present during the search or whether he used the pronoun "we" as an "editorial *we.*"

Clements alternatively seeks a new trial or dismissal of the indictment because Agent Lucas's use of the word "we" before the grand jury in describing how and which police officers secured and executed the warrant was inconsistent with the police report and affidavit. Before the district court may dismiss the grand jury indictment based upon Agent Lucas's purported inconsistent statements, Clements must show actual prejudice resulting from Agent Lucas's statements. *Bank of Nova Scotia v. United States*, 487 U.S. 250, 254 (1988). Whether Agent Lucas testified that he was–or was not–one of the team who executed the search warrant and arrested Clements would have had little influence on the grand jury's decision to indict, especially given that the trial jury subsequently found Clements guilty as charged in the indictment beyond a reasonable doubt. *See Mechanik*, 475 U.S. 66, 73 (1986) (holding that a petit jury's guilty verdict for drug-related offenses established the probable cause to charge defendants with the offenses and rendered harmless any error in the grand jury's charging decision that may have resulted when two law enforcement agents testified in tandem before a grand jury; further, societal costs of retrial were too substantial to justify setting aside verdict when the error had no effect on the outcome of the trial).

## 2. Newly Discovered Evidence Claim

To the extent that Clements seeks a new trial based upon newly discovered evidence under FED. R. CRIM. P. 33, ordinarily Clements must establish that the new evidence: (1) was discovered after trial; (2) could not have been discovered earlier through due diligence; (3) is material and not

merely cumulative or impeaching; and (4) would likely produce an acquittal. *United States v. O'Dell*, 805 F.2d 637, 640 (6th Cir. 1986). However, because Clements asserts that the new evidence at issue is exculpatory and the government failed to turn it over in violation of *Brady*, Clements need not show that the evidence probably would have resulted in acquittal. *See id*. at 641. Instead, the *O'Dell* test is "modified" such that Clements "must show only that the favorable evidence at issue was 'material,' with 'materiality' defined according to opinions interpreting the *Brady* doctrine." *United States v. Frost*, 125 F.3d 346, 382 (6th Cir. 1997) (citations omitted). In the *Brady* context, evidence is "material" if "there is a *reasonable probability* that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Kyles v. Whitley*, 514 U.S. 419, 433 (1995) (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)) (emphasis added). Materiality does not depend upon "whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles*, 514 U.S. at 434.

Just as Clements fails to establish materiality for establishing a *Brady* violation, *supra*, he also fails to satisfy materiality under the modified standard for a new trial based upon newly discovered evidence. Though the allegations against Agent Lucas, if ultimately proved true, are troubling, Agent Lucas only had a tangential connection to Clements's prosecution, and the evidence purportedly impugning Agent Lucas's credibility does not undermine the fairness of Clements's trial.

### III. Conclusion

For the foregoing reasons, we **AFFIRM**.