NOT RECOMMENDED FOR PUBLICATION
File Name: 15a0211n.06

Case No. 14-5825

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
Mar 16, 2015
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | ON APPEAL FROM THE UNITED STATES |
| | ) | DISTRICT COURT FOR THE WESTERN |
| v. | ) | DISTRICT OF TENNESSEE |
| | ) | |
| ANDRE HUGHES, | ) | |
| | ) | OPINION |
| Defendant-Appellant. | ) | |
| | ) | |
| _____ | ) | |

Before: CLAY, GILMAN, and SUTTON, Circuit Judges.

**RONALD LEE GILMAN, Circuit Judge.** Andre Hughes was only three weeks away from completing his five-year term of supervised release when he was arrested for possession of cocaine. The arrest came after a traffic stop in which he was the driver and sole occupant of his girlfriend's car. On the date of his arrest, his girlfriend LaDedra Hampton told police officers that the cocaine was in fact hers. Hampton subsequently repeated this claim three more times— twice orally and once in writing—prior to Hughes's revocation hearing. But Hampton changed her story at the hearing, claiming for the first time that she had nothing to do with the cocaine in question. The district court chose to credit Hampton's testimony over Hughes's and revoked Hughes's supervised release, sentencing him to 51 months in prison. On appeal, Hughes challenges the district court's credibility determination. For the reasons set forth below, we **AFFIRM** the judgment of the district court.

## I. BACKGROUND

### A.    Hughes's term of supervised release and his 2014 arrest

After entering a guilty plea in 2000, Hughes was sentenced to 125 months' imprisonment and 60 months of supervised release for possessing both powder and crack cocaine with the intent to distribute, in violation of 21 U.S.C. § 841(a)(1). Subsequent retroactive amendments to the Sentencing Guidelines led to a five-month reduction of Hughes's prison sentence in 2008. His term of supervised release was not modified.

Hughes was released from custody and began his term of supervised release in April 2009. With only three weeks remaining on the five-year period of supervision, Hughes was arrested during a traffic stop in Memphis, Tennessee in April 2014. Upon searching the vehicle, Officer Jeffrey Harris and his partner Officer Saldana (whose first name does not appear in the record) discovered a 17-gram bag of powder cocaine and a digital scale that was designed to look like a cell phone. The drugs were "wedged between the driver's seat . . . and the center console" but, according to Officer Harris, they were visible to anyone driving the car. The scale was sitting on the passenger seat in plain view. A search of Hughes's person uncovered $2,347 in cash.

Based on this evidence, Hughes was "arrested for having committed the offenses of Possession with Intent to Manufacture/Deliver/Sell a Controlled Substance, to wit: Cocaine and Possession of Drug Paraphernalia." After placing Hughes under arrest, the officers traveled to the hotel where Hughes had been staying with his then-girlfriend Hampton. The car that Hughes was driving at the time of his arrest was hers. While speaking to the officers at the hotel,

Hampton voluntarily told them that she was responsible for the cocaine in the car. Nonetheless, the officers declined to either arrest Hampton or release Hughes.

**B.      Revocation hearing**

On April 21, 2014, the Probation Office filed a petition requesting that the district court revoke Hughes's supervised release due to his drug arrest earlier that month. A revocation hearing was held before the district court in July 2014.

In addition to Officer Harris, who testified to the facts surrounding Hughes's arrest in April 2014, the government called Probation Officer Freddie McMaster. McMaster said that Hughes had done some construction work in the months leading up to his arrest, but described Hughes's recent employment history as "minimal" and "sporadic." On the other hand, McMaster testified that Hughes had not failed any drug tests during the period of supervision.

For its part, the defense called several witnesses, the first of whom was Race Bennett, an investigator with the Office of the Federal Defender. Bennett's testimony focused on an interview that he had had with Hampton. During the interview, Hampton related that she and Hughes were staying together in a hotel on the day of Hughes's arrest. She told Bennett that she had just returned from a trip to California and that the two were attempting to rekindle their relationship. But the couple quarreled and the attempted reconciliation failed. Hughes subsequently left the hotel in Hampton's car. Hampton told Bennett that (1) she was the true owner of the cocaine recovered from her car, and (2) she had concealed the drugs from Hughes because he disapproved of her narcotics use. Prior to the hearing, Hampton told substantially similar versions of this story to two different attorneys with whom she conferred on separate occasions.

But when called to testify at the revocation hearing, Hampton recanted her prior statements. Hampton acknowledged that she had previously admitted ownership of the cocaine on four separate occasions, but insisted that those admissions were false. She explained that her earlier lies were made in an attempt to help Hughes, whom she was dating at the time. But she said that she never thought that her lies would "get this far" and that she "was not prepared to come to court under oath and lie." Specifically, Hampton explained that, after considering the consequences of her prior statements, she was "not prepared to jeopardize [her] life and [her] daughter's for someone of [Hughes's] character."

Hughes was the final defense witness. He testified that, at the time he was pulled over, he had been on the road for only three to four minutes. Hughes insisted that he had no knowledge of the cocaine prior to its discovery by police. If he had known that there were incriminating items in the car, he explained, he would never have consented to the vehicle's search by the police.

Hughes stated on direct examination that, when he was pulled over, he had been driving toward Home Depot to purchase supplies for remodeling work that he was doing on his sister's home. According to Hughes, the large sum of cash in his possession was not drug proceeds but rather money from his sister for building supplies. A letter from Hughes's sister corroborated this story. But his sister did not testify at the hearing due to an alleged conflict with her work schedule.

On cross-examination, Hughes changed his story to indicate that he was in fact going to Lowe's, not to Home Depot:

> **Q.** You said that you were on your way to Home Depot?
>
> **A.** Yeah.

**Q.** And what Home Depot were you going to?

**A.** On Summer, the one on Summer.

**Q.** The one on Summer? Where is that exactly?

**A.** Well, when you pass Walgreens, I think Summer and Graham, Summer and Graham.

**Q.** Oh, you mean Lowe's?

**A.** Yeah, Lowe's that's where I was going, Lowe's.

When pressed by the prosecutor, Hughes could not recall the exact details of what supplies he planned to purchase that day:

**Q.** So how many boards were you going to buy? . . .

**A.** I was just going to pick up some supplies, man, I don't know how many boards --

**Q.** Mr. Hughes, how many boards?

**A.** I don't know, sir.

**Q.** Do you want to recant your testimony at this point?  The truth will set you free, do you want to recant your testimony?  This is the time, Mr. Hughes.

. . .

**A.** I was going to pick up supplies.

Hughes also offered his own theory for Hampton's last-minute change of tune.  He claimed that Hampton testified that the cocaine was his because he had recently broken up with her due to her "habit of cocaine addiction."  According to Hughes, he was not aware of Hampton's cocaine usage when their relationship began.

**C.     The district court's ruling**

At the end of the hearing, the district court issued its ruling from the bench.  The court found both Police Officer Harris and Probation Officer McMaster to be credible.  It similarly

found Hampton to be a "very credible witness" and "as sincere as a human being can be while testifying." Hampton, the court reasoned, was willing to falsely admit her guilt to the police and third parties but was "not willing to come down here and lie under oath in federal court[;] that's believable."

In support of its finding that Hampton's in-court statements were truthful but that her statements made prior to the in-court hearing were fabricated, the district court stated that a number of Hampton's prehearing statements were not consistent with her in-court testimony and that some of the prior statements were not "factually consistent with the actual evidence." For instance, (a) according to her written statement, the cocaine was found *in* the console, but no one disputes that the cocaine was actually found *adjacent to* the console; (b) her in-court testimony suggested that Hughes left with the car while she was out of the hotel room, but her written statement indicated that Hughes left after an argument in the room so that the two could cool down; and (c) in her prior statements, Hampton said she had just returned to Memphis from San Francisco, but during her in-court testimony she stated that she had actually been in San Diego.

The only witness that the district court deemed not credible was Hughes. In its oral ruling, the court explained that Hughes's "serious criminal history," which involved an earlier felony drug conviction, suggested that he was "not that believable" in this case. The court was particularly skeptical of Hughes's testimony that the $2,347 found on his person was for purchasing building supplies, finding that to be "pretty unbelievable." Although Hughes's sister corroborated that story in a letter to the court, the court dismissed the legitimacy of that letter because his sister said that he was going to Home Depot, whereas Hughes testified that his actual destination was Lowe's. The district court also discounted Hughes's assertion that, if he had

known the drugs and scale were in the car, he would have objected to the officers' request to search the vehicle. As reasoned by the court:

> The scale was on the seat. [The officers] saw the scale. The defendant knew, it was reasonable to conclude, he knew it looked like a cell phone, he felt pretty good about that. He wasn't worried about saying don't go look, it looked like a cell phone. But the officers, it's not the first time they have been around the block, it turns out it's a digital scale. That's what it looks like happened here.

The court offered no explanation, however, as to why Hughes would consent to the search despite the presence of the cocaine that he allegedly knew was in the car.

Based on these findings, the court revoked Hughes's supervised release and sentenced him to 51 months' imprisonment. This timely appeal followed.

## II. DISCUSSION

### A. Standard of review

A district court has the power to "revoke a term of supervised release, and require the defendant to serve [time] in prison . . . if the court . . . finds by a preponderance of the evidence that the defendant violated a condition of supervised release." 18 U.S.C. § 3583(e)(3); *see also United States v. Carr*, 421 F.3d 425, 429 (6th Cir. 2005) ("In order to revoke [the defendant's] supervised release and return him to prison, the district court was required to find by a preponderance of the evidence that [he] had violated one or more of its conditions."). We review the district court's decision "for abuse of discretion, giving fresh review to its legal conclusions, and clear-error review to its fact findings." *United States v. Kontrol*, 554 F.3d 1089, 1091-92 (6th Cir. 2009) (internal citations omitted). "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 573-74 (1985).

But the factfinder's leeway is not limitless. "A finding is 'clearly erroneous' when[,] although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948). Although a trial judge's determination regarding credibility is entitled to great deference on review, "the court of appeals may well find clear error even in a finding purportedly based on a credibility determination" when the key witness's story is "internally inconsistent or implausible." *Anderson*, 470 U.S. at 575.

**B.     The district court's decision to credit Hampton's testimony over Hughes's did not constitute clear error**

The outcome of Hughes's revocation hearing depended entirely on the question of which witness should be believed. Despite the significant deference afforded such determinations, Hughes argues that Hampton's testimony was so implausible in light of her prior statements that the district court committed clear error by crediting her testimony. His objection is not frivolous.

Several of the district court's comments regarding the testimony by Hampton and Hughes are in fact somewhat puzzling. Two examples are illustrative. First, as discussed above, the district court suggested that a couple of Hampton's prior statements were unbelievable simply because they were inconsistent with her testimony in court. But this conclusion assumes the accuracy of the in-court testimony and is therefore miscast as evidentiary support for the out-of-court statements' inaccuracy. Second, the district court was skeptical of Hughes's suggestion that he would not have consented to the officers' search of the car had he known about the cocaine next to the console. But the district court's reasoning on this score focused exclusively on the digital scale hidden in plain sight as a cellphone look-alike, without reference to the cocaine that, according to the court, Hughes knew was in the vehicle.

In several instances, the district court also placed unwarranted importance on relatively minor inconsistencies in Hughes's testimony. For instance, in deeming Hughes not credible, the court appears to have relied heavily on the fact that Hughes initially testified that he was driving to Home Depot before later stating that his destination was in fact Lowe's. But confusing two largely identical big-box retailers is not necessarily an incriminating mistake, particularly where, as here, Hughes accurately testified to the general location of the store and might have simply misstated the name.

Despite these weaknesses in the district court's analysis, however, its credibility determination does not warrant reversal. *See Anderson,* 470 U.S. at 573-74 ("If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently."). Hampton's testimony, though inconsistent with her prior statements, was neither "*internally* inconsistent" nor "implausible on its *face*." *Id*. at 575 (emphases added). Nor does the record contain any documents or objective evidence contradicting Hampton's in-court testimony. *See id.* Rather, the district court based its ruling on its "decision to credit the testimony of one of two or more witnesses, each of whom has told a coherent and facially plausible story that is not contradicted by extrinsic evidence." *Id.*

So although Hughes has pointed out that portions of the district court's credibility determination rested on less-than-ironclad reasoning, these gaps in logic do not clearly outweigh the suspicious circumstances that point to Hughes's knowing possession of the cocaine in the car. A factfinder's latitude in weighing the evidence is at its greatest in this context, and the court's determination under the facts presented here was not so unsupported as to merit reversal.

## III.    CONCLUSION

For all the reasons set forth above, we **AFFIRM** the judgment of the district court.