NOT RECOMMENDED FOR FULL-TEXT PUBLICATION

File Name: 17a0318n.06

**Case No. 16-1785**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

FILED

Jun 08, 2017

DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| v. | ) | COURT FOR THE EASTERN |
| | ) | DISTRICT OF MICHIGAN |
| ALVIN RAY, | ) | |
| | ) | |
| Defendant-Appellant. | ) | |

BEFORE:    KEITH and CLAY, Circuit Judges; MARBLEY, District Judge.[*]

MARBLEY, District Judge.  This case is before us a second time, following a remand to the district court to conduct an evidentiary hearing on Alvin Ray's motion to suppress statements he made to the police after receiving a "midstream" *Miranda* warning.  *See United States v. Ray (Ray I)*, 803 F.3d 244 (6th Cir. 2015).  On remand, the district court conducted a hearing and applied the midstream *Miranda* warning test from *Missouri v. Seibert*, 542 U.S. 600 (2004), as we instructed, but still found Ray's post-*Miranda* confession admissible.  *United States v. Ray*, No. 13-20143, 2016 WL 3180184 (E.D. Mich. June 8, 2016).  As explained below, however, a reasonable person in Ray's shoes would not have viewed the post-*Miranda* questioning as a "new and distinct experience" that presented "a genuine choice whether to follow up on [his]

---

[*] The Honorable Algenon L. Marbley, United States District Judge for the Southern District of Ohio, sitting by designation.

earlier admission." *Ray I*, 803 F.3d at 272-73 (quotation omitted). Accordingly, we reverse and remand for a new trial.

## I. BACKGROUND

We already recited the relevant facts in Ray's first appeal. The short version is that, upon receiving complaints of drug activity at a residence on Genesee Street, Detroit police officers arranged for a controlled buy using a confidential informant ("CI"). The CI returned carrying a bag of marijuana that he claimed he purchased from a black male named Alvin Ray. The police then obtained a search warrant and returned the next afternoon to execute it.

Upon executing the warrant, the police discovered Ray and his longtime girlfriend, Cara Lee (the mother of Ray's teenaged son), asleep upstairs. The officers rousted the pair from bed, took them down to the living room, handcuffed them, and made them face a wall while the officers searched the house for drugs and contraband. The officers ultimately discovered marijuana, crack cocaine, an unloaded shotgun, several shotgun shells, a .22 caliber rifle, and a semiautomatic handgun in various rooms of the house.

Ray and Lee remained detained in the living room for roughly an hour while the officers executed the warrant. Several officers walked through the living room at different times, but no single officer maintained custody of Ray and Lee during the entirety of the search.

Ray and Lee testified on remand and told essentially the same story: (1) that one or more officers remarked that there were enough guns in the house for both Ray and Lee to go to jail; (2) that one or more officers commented on Lee's status as a state-court employee and made veiled threats about her continued employment; (3) that an officer asked Ray whether he had been to jail before, to which Ray replied that he had been to federal prison; (4) that the same officer chastised Ray for destroying the community by selling drugs; (5) that the same officer

asked who owned the guns the police found in the house; and (6) that, in response, Ray took the blame for the guns to spare Lee the embarrassment of being arrested or losing her job.

Five of the officers who executed the warrant also testified on remand, while a sixth died before Ray's original trial and, thus, was unable to testify. The officers generally denied that anyone discussed the guns or drugs with Ray while they were in the house. Not one of the officers testified that a threat, whether explicit or implicit, was made to Ray or that he was questioned at the house. The officers explained that it would have violated their procedures to question Ray (or Lee) in the home or in the presence of one another. The officers further testified that any discussion with Ray and Lee while at the house was limited to collecting routine biographical information and to general topics, like sports and the weather. That said, Officers Wiencek and Robson admitted that they spoke to Lee about her son and her employment at the Wayne County Friend of the Court's Office. And several officers left open the possibility that someone on their task force asked Ray and Lee about who owned the guns in the home. But not one officer could recall Ray claiming ownership, whether solicited or unsolicited, of the guns or drugs while at the house.

After the search concluded, the officers arrested Ray (but not Lee) and took him to the local police station for questioning. Once there, Officers Hill and Robson gave Ray *Miranda* warnings for the first time, both orally and in writing. Ray signed a *Miranda* warning form and certified that he had not been threatened or promised anything. He also agreed to answer their questions. At that point, the officers allege that Ray first told them that the marijuana and shotgun belonged to him, but he denied ownership of the crack cocaine and the other guns. Ray testified that, during the interrogation, he admitted that the shotgun and marijuana were his (but not the other firearms) because he already had admitted to it earlier at the house, and

because he was afraid that if he denied ownership now, the police would retaliate against him by arresting and charging his girlfriend.

As a result of the search and Ray's statements to the police, he was convicted of one count of being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g); two counts of possession with intent to distribute controlled substances (cocaine and marijuana), in violation of 21 U.S.C. § 841; and one count of possession of a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c). Lee was not charged with any crimes.

Ray appealed his convictions on several grounds, one of which we found potentially meritorious. *Ray I*, 803 F.3d at 251. Accordingly, we reversed his convictions and remanded the matter to the district court to conduct an evidentiary hearing regarding the admission of Ray's station-house confession. *Id.* In so doing, we explicitly adopted the "multi-factor test" from *Missouri v. Seibert* to govern the admissibility of statements given after "midstream *Miranda* warnings." *Id.* at 272-73 (citing *Seibert*, 542 U.S. at 616 (plurality opinion)).

On remand, the district court held an evidentiary hearing, as instructed, and applied the multi-factor test from *Seibert* before determining that Ray's confession was admissible. *Ray*, 2016 WL 3180184, at *4-5. The court first concluded that most of Ray's testimony during the hearing was not credible. *Id.* at *3 ("With such discrepancies in Ray's testimony on such basic facts as the race of the threatening police officer, content of his threat, and timing of the admission, Ray's testimony [regarding coercive conduct] is not credible. Moreover, no testimony by any police officer at trial or the evidentiary hearing supports Ray's account . . . ."). The court then examined each of the five factors from *Seibert* and concluded that not one of them supported a finding that Ray's police-station confession was inadmissible. *Id.* at *4-5. Next, the court found that Ray's station-house *Miranda* waiver was made knowingly,

voluntarily, and intelligently. *Id.* at *5. As a result, the court concluded that Ray's post-*Miranda* statements were properly admitted at trial. *Id.*

## II. STANDARD OF REVIEW

In determining the admissibility of statements allegedly taken in violation of a defendant's *Miranda* rights, we review the district court's factual findings for clear error and its legal conclusions de novo. *Ray I*, 803 F.3d at 265. We generally defer to the district court's assessments of credibility, review the evidence in the light most favorable to the district court's decision, and consider the evidence in the light most favorable to the government. *Id.*

## III. ANALYSIS

Ray argues that the district court erred by concluding that the midstream *Miranda* warnings he received were effective under the multi-factor test announced in *Seibert*. Before turning to that question of law, we must first address the district court's factual findings. As explained below, those findings were incomplete and placed unwarranted importance on minor inconsistencies in Ray's testimony. Despite these weaknesses in the district court's analysis, we uphold the court's factual findings because they fall short of clear error. Nevertheless, even accepting the district court's factual findings, we disagree with the court's legal conclusions under *Seibert*. Ray's station-house confession is inadmissible.

### A. The District Court's Factual Findings Were Not Clearly Erroneous.

Before turning to *Seibert*, we must assess the district court's factual findings, which pervaded the rest of the court's analysis. The court found that, "[a]t most . . . a police officer asked [Ray] and Lee 'whose guns are these?' and [Ray] individually 'have you ever been to jail before?'" while at the house. *Ray*, 2016 WL 3180184, at *4. Ray testified that he responded by saying "those are my guns" and "I have been to federal prison." *Id.* Based on this "brief and

cursory exchange," the court found that the Government had met its burden of admissibility under *Seibert*. *Id.* at *4-5.

The district court based these findings on its determination that Ray's story was mostly unbelievable since it had changed over time. *Id.* at *3 (noting inconsistencies between Ray's trial testimony and evidentiary hearing testimony as to: (1) which of six officers initially spoke to him; (2) whether that officer made a declarative statement that Ray and Lee were going to jail or asked "whose guns are these?" before threatening that Ray and Lee were going to jail; and (3) whether Ray immediately admitted to owning the guns or paused before doing so). From our vantage, these discrepancies were minor and largely irrelevant. The inconsistencies that the district court focused on—i.e., *which* officer threatened Lee, *what* verbiage he used, and *how long* it took Ray to respond to the threat—did not address whether the conversation actually occurred. *See United States v. Hughes*, 604 F. App'x 448, 453 (6th Cir. 2015) (critiquing district court for placing "unwarranted importance on relatively minor inconsistency in [defendant's] testimony").

Even more troubling, however, is the fact that the court omitted any discussion of Cara Lee's testimony. Lee testified at length, and her testimony largely corroborated Ray's version of events—including significant corroboration as to receipt of threats from the officers and more in-depth interrogation than the officers let on. Yet in weighing the credibility of Ray's testimony against the officers' testimony, the court failed to mention Lee's testimony at all. We do not know if the court found her version of events credible, not credible, or partially credible. This is deeply troubling, especially since our court often relies on credibility determinations based on the consistency of two witnesses' accounts. *See, e.g.*, *United States v. Garrido*, 467 F.3d 971, 979 (6th Cir. 2006) (concluding that "consistency of the two officers' accounts" indicates that

their statements were credible); *United States v. Simmons*, 174 F. App'x 913, 917 (6th Cir. 2006) (finding witnesses' testimony credible because it was "substantively consistent").

Finally, the circumstances of Ray's arrest seem consistent with his (and Lee's) version of events. Consider: the police raided a house; found guns and drugs inside; handcuffed the only two occupants and engaged in continuous conversation with them; chatted about Lee's son, her employment, and, as the district court concluded, who owned the guns—but then proceeded to talk about nothing else but sports and the weather for an hour. It seems plausible that the police spoke about more than just sports and the weather and that their conversation turned to whether Lee might be arrested or fired, who owned the guns, who owned the drugs, and Ray's prior criminal record—as Ray and Lee collectively testified. The fact that the police arrested Ray but not Lee buttresses his testimony that the police engaged in more fulsome interrogation and that he admitted to owning the shotgun and the marijuana. Otherwise, why would the police let Lee go free? She lived in the house, she was in the bedroom where the police found the marijuana, and she was present and near the shotgun behind the bedroom door, just as Ray was.

Even considering these shortcomings in the court's credibility determinations, we are hard-pressed to find them clearly erroneous. After all, we are left with a "he said, they said" scenario, and in cases "[w]here there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *United States v. Dillard*, 438 F.3d 675, 681 (6th Cir. 2006) (quotation omitted). This deference holds true even when the court "place[s] unwarranted importance on relatively minor inconsistencies in [a witness's] testimony" and "[d]espite . . . weaknesses in the district court's analysis." *Hughes*, 604 F. App'x at 453; *see also United States v. Ray*, 361 F. App'x 674, 676 (6th Cir. 2010) (affirming denial of motion to suppress where "the only testimony that supports [defendant's] story is his own and that of his

then-girlfriend[,] Tameka Brooks . . . both of which the district court found lacked credibility"). Accordingly, we accept the district court's credibility determinations and factual findings.

**B.  The District Court Erred as a Matter of Law by Finding Ray's Midstream *Miranda* Warnings Effective Under *Missouri v. Seibert*.**

Even accepting the district court's factual findings regarding the limited pre-*Miranda* exchange between Ray and the police while at the house, we conclude that the court erred by finding the later station-house *Miranda* warnings effective under *Seibert*.  De novo review requires our court to draw its *own* conclusions from the facts about whether a reasonable person "could have seen the station house questioning as a new and distinct experience, [and whether] the *Miranda* warnings could have made sense as presenting a genuine choice whether to follow up on the earlier admission."  *See Ray I*, 803 F.3d at 272-73 (quotation omitted); *see also United States v. Wooten*, 602 F. App'x 267, 272 (6th Cir. 2015).

1.  Ray Was Subject to Custodial Interrogation at the House, Triggering *Seibert*.

Before turning to the multi-factor test from *Seibert*, we dispense with the Government's argument that *Seibert* does not apply because there was no custodial interrogation at the house. *See United States v. Courtney*, 463 F.3d 333, 337 (5th Cir. 2006) (holding that, because first statement did not violate *Miranda*, *Seibert* did not apply); *United States v. Kiam*, 432 F.3d 524, 531 (3d Cir. 2006) (holding that *Miranda* warnings were not required before routine questions by border patrol, so *Seibert* was inapplicable to post-*Miranda* confession).

To be sure, the district court discredited Ray's testimony as to whether "the police officers' conduct during the house search . . . amount[s] to coercion that tainted [his] later *Mirandized* statements."  *Ray*, 2016 WL 3180184, at *3 (assessing whether police engaged in coercive conduct so as to render Ray's later confession inadmissible under *Oregon v. Elstad*, 470 U.S. 298 (1985)).  Thus, we must accept that the police did not threaten to imprison Lee or

Ray if they failed to admit ownership of the guns. *Id.* ("[T]he evidence does not reflect that Ray was subject to objectively coercive police conduct that motivated a decision to confess.").

But the court went on to accept the following facts: (1) that a police officer asked Ray and Lee "whose guns are these?"; (2) that the same officer asked Ray individually "have you ever been to jail before?"; and (3) that Ray responded by saying, "those are my guns" and "I have been to federal prison." *Id.* at \*4; *see also id.* at \*1 ("Ray says that a police officer then questioned him about the guns that were seized, prompting him to admit they were his."). Even this brief and cursory exchange amounted to a custodial interrogation that required *Miranda* warnings. *See Rhode Island v. Innis*, 446 U.S. 291, 300-01 (1980) ("We conclude that the *Miranda* safeguards come into play whenever a person in custody is subject to either express questioning or its functional equivalent. . . . A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation.").

For starters, there is no dispute that Ray was handcuffed at the time and, thus, "in custody" for *Miranda* purposes. *See Ray I*, 803 F.3d at 266 n.12 (collecting cases). And asking a suspect whether he had a criminal record and owned or possessed a firearm certainly amounts to "express questioning" that "police should know is reasonably likely to evoke an incriminating response." *See Innis*, 446 U.S. at 300-01; *see also United States v. Ashmore*, 609 F. App'x 306, 309-10, 317 (6th Cir. 2015) (affirming suppression of pre-*Miranda* statement "that the car might contain a revolver" in response to question, "Do you have . . . any weapons on you or in the car?"; "Agent Jenkins asked pre-*Miranda* the one compound question relevant to a felon-in-possession charge: is there a gun in the car and are your fingerprints on it?"). Unlike in *Courtney*, *Kiam*, and other cases where courts concluded that *Seibert*'s midstream

*Miranda* warning test did not apply—Ray was both in custody and subject to custodial interrogation while at the house.

We therefore turn our attention to the multi-factor test from *Seibert*, bearing in mind that the burden of showing admissibility of a confession under that test rests on the Government—not Ray. *Ray I*, 803 F.3d at 270 ("[T]he burden of showing admissibility rests, of course, on the prosecution." (quoting *Seibert*, 542 U.S. at 608 n.1)).

> 2. The Completeness and Detail of the Questions and Answers in the First Round of Interrogation Suggest that the *Miranda* Warnings Were Ineffective.

The first *Seibert* factor—which looks to "the completeness and detail of the first round of interrogation"—suggests that the *Miranda* warnings Ray ultimately received at the police station were ineffective. By asking Ray about his possession and ownership of the guns, as well as his prior stint in federal prison, the officers "asked pre-*Miranda* the [only] question[s] relevant to a felon-in-possession charge." *Ashmore*, 609 F. App'x at 317. In *Ashmore*, as here, the initial, pre-*Miranda* questioning "was not as detailed as in *Seibert*." *Id.* Nevertheless, we still mandated suppression of the incriminating post-*Miranda* statements because the police asked, pre-*Miranda*, all the questions they needed to obtain a conviction. *Id.* ("Under the plurality's test, all of the factors suggest that Agent Jenkins' question-first, *Mirandize*-later tactic requires suppression of the post-*Miranda* admission.").

So too, here. Even accepting the district court's factual findings, the officers still asked Ray all the questions they needed to make an arrest, tailor their post-*Miranda* interrogation, and secure a conviction. *Id.*; *see also United States v. Pacheco-Lopez*, 531 F.3d 420, 422, 428 (6th Cir. 2008) (finding first factor satisfied where initial questioning consisted of asking defendant's name, where he lived, and how he arrived at the house in drug trafficking case). Under these circumstances, the officers' initial questioning (and Ray's responses) were detailed

and complete enough to suggest that the station-house *Miranda* warnings were ineffective. *Ashmore*, 609 F. App'x at 317.

### 3. The Overlapping Content of the Two Statements Suggests that the *Miranda* Warnings Were Ineffective.

The second *Seibert* factor—which looks to "the overlapping content of the two statements"—also suggests that the *Miranda* warnings Ray received at the police station were ineffective. The district court concluded that there was "minimal" overlap because Ray provided "extended admissions" at the police station that he did not give in his "abbreviated response[s] at the house." *Ray*, 2016 WL 3180184, at *4. We disagree.

At the house, Ray admitted to owning the guns and having served time in federal prison. During the station-house questioning, the officers followed up on those responses based on "the knowledge [they] gleaned during the initial questioning." *See Pacheco-Lopez*, 531 F.3d at 428 (finding the second factor satisfied where officers followed up on previous questions and answers). As in *Pacheco-Lopez*, the questions regarding who owned the guns and what Ray knew about them were not "anomalous, which might support a finding that the warning was effective, but [were] the next logical question[s] based on the earlier statements." *Id.*; *see also Ashmore*, 609 F. App'x at 317 ("The second . . . factor[] favor[s] suppression because the pre- and post-*Miranda* questioning was materially the same . . . .").

To be sure, during their post-*Miranda* questioning, the officers *also* inquired about the drugs they discovered while executing the search warrant. And, because we accept the district court's factual findings, those would have constituted "new" questions during the second round of interrogation. But asking some "new" or "amplifying" questions during a post-*Miranda* interrogation does not render such a warning effective where pre-*Miranda* interrogation along similar lines already occurred.

In *Pacheco-Lopez*, for example, the officers asked questions regarding the defendant's identity, where he lived, and how and when he arrived at the target residence before reading him his *Miranda* rights. 531 F.3d at 420. Upon learning that Lopez was from Mexico and had driven to the home in Kentucky that week, the officers read him his *Miranda* rights and then began asking follow-up questions as to whether he had brought any cocaine to the residence. *Id.* Technically, these were "new" questions as compared to the pre-*Miranda* interrogation, but our court correctly viewed them as "the next logical question[s] based on the earlier statements"— thus satisfying the second *Seibert* factor for overlapping content. *Id.* at 428.

Likewise, in *Ashmore*, the arresting officer asked the defendant if he had any guns on him or in his car, or if his fingerprints would be found on any weapons they discovered in the vehicle, all before advising him of his *Miranda* rights. 609 F. App'x at 308. After Ashmore responded that the car "probably" contained a revolver, the officer arrested him and advised him of his *Miranda* rights. *Id.* During the post-*Miranda* interrogation, the officer continued along the same line by asking Ashmore if he was a convicted felon and whether he knew that he could not lawfully possess firearms. *Id.* But the officer did not stop there; instead, he also asked Ashmore whether he used illegal drugs, to which Ashmore responded that he smoked crack cocaine. *Id.* By that time, the officers searching the vehicle had discovered a gun and various drugs and drug paraphernalia in the car. *Id.* As in *Pacheco-Lopez*, the post-*Miranda* interrogation involved some new and amplifying information. But rather than applying a hyper-technical analysis of whether the pre- and post-*Miranda* questioning and answers mirrored one another, our court found substantial overlap between the two and suppressed the post-*Miranda* statements.

*Id.* at 317 ("Agent Jenkins picked his line of questioning up post-*Miranda* right where he left off pre-*Miranda*—he wanted to know what Ashmore knew about the gun . . . .").

Even accepting the district court's factual findings, we find substantial overlap between the content of Ray's pre- and post-*Miranda* statements, thus satisfying the second *Seibert* factor. Ray elaborated on his earlier admissions, but that elaboration was made possible solely because of the overlapping content between what he was asked pre- and post-*Miranda*.

### 4. The Timing and Setting of the First and Second Interrogations Suggest that the *Miranda* Warnings Were Ineffective, but this Factor Presents a Close Call.

The third *Seibert* factor—which looks to "the timing and setting of the first and second interrogations"—is a wash. The district court found that the forty-five minute interval between when Ray was questioned at the house and the police station, coupled with the change in location, were enough "to create a new and distinct experience for Ray in making the decision of whether or not to admit his crimes." *Ray*, 2016 WL 3180184, at *4 (quotation omitted).

Make no mistake: there was a break in the timing and setting of Ray's two interrogations that exceeds the facts from *Seibert* (twenty minute gap in time; same location); *Pacheco-Lopez* (no gap in time; same location); and *Ashmore* ("second interrogation followed shortly after the first"; slight change in location). *See Seibert*, 542 U.S. at 616 (plurality opinion); *Pacheco-Lopez*, 531 F.3d at 427; *Ashmore*, 609 F. App'x at 317. Ray's first round of questioning occurred while he was handcuffed in the living room, with his face to the wall. Ray's second round of questioning occurred roughly forty-five minutes later, in an interrogation room at the local police station. Ordinarily, this separation "both in time and in setting" would suggest that "the third *Seibert* factor does not weigh as strongly against a finding of effectiveness as it otherwise might." *See Wooten*, 602 F. App'x at 274; *see also Coomer v. Yukins*, 533 F.3d 477, 491 (6th Cir. 2008) (holding that "[e]ven under the *Seibert* plurality's test," moving a suspect to

- 13 -

a police station and waiting "several hours" to resume interrogation ordinarily constitutes a "new and distinct experience" for *Miranda* purposes (quotation omitted)).

Ray argues that, from the vantage of a reasonable person in his shoes, the same coercive elements survived his brief transfer from the house to the police station. In other words, Ray argues that a forty-five minute break in questioning involving some of the same officers and the same topics is no different than the twenty minute break in *Seibert*. He likewise argues that both settings were coercive because in the first, he was: (1) handcuffed; (2) being asked about a set of guns the officers had discovered in their house; and (3) worried about protecting his long-time girlfriend, with whom he shared a young son; while in the second, he was: (1) under arrest; (2) at a police station; (3) being asked about the same incriminating topics; (4) segregated from Lee; and (5) still uncertain of her status.

Given these circumstances, we find that the timing and setting of the two interrogations "does not weigh as strongly against a finding of effectiveness as it otherwise might." *Wooten*, 602 F. App'x at 274. This factor cuts both ways and sheds little light on whether the station-house *Miranda* warnings were ineffective as "presenting a genuine choice whether to follow up on [Ray's] earlier admission[s]." *See Seibert*, 542 U.S. at 616 (plurality opinion).

   5. The Continuity of Police Personnel Suggests that the *Miranda* Warnings Were Ineffective.

The fourth *Seibert* factor—which examines "the continuity of police personnel"—informs that the *Miranda* warnings Ray received at the police station were ineffective. The district court determined that this factor "does not support a finding of inadmissibility" because Ray testified "that the police officer who threatened Lee's arrest at the house was James Wiencek," while "the interrogating police officers who questioned Ray at the police

station were Gregory Robson and Patrick Hill." *Ray*, 2016 WL 3180184, at *4 ("Thus . . . Ray's own testimony disqualifies him under this factor of the midstream *Miranda* test.").

The district court was correct in one sense but still missed the bigger picture. In this case, the same officers who conducted the second interrogation were intimately involved in the first. Officers Robson and Hill were at the house during the execution of the search warrant. They worked for the same law-enforcement agency and the same task force as did Officer Wiencek. They traversed through the living room while Lee and Ray were handcuffed and detained. Indeed, Robson and Hill were within hearing of most, if not all, of the conversations and questioning while Ray was in custody and making his pre-*Miranda* statements. Thus, while the same *officer* did not conduct both the pre- and post-*Miranda* questioning, there was at least a "continuity of police *personnel*" during both rounds of questioning. *See Seibert*, 542 U.S. at 616 (plurality opinion) (emphasis added).

Contrast these facts with the Government's case-in-support, *United States v. Hernandez-Hernandez*, 384 F.3d 562 (8th Cir. 2004). There, a state trooper and Border Patrol agent took turns conducting the initial, pre-*Miranda* questioning at a traffic stop and by telephone, only to have an Immigration and Naturalization Service agent conduct the follow-on, post-*Miranda* questioning five days later at the INS office. *Id.* at 563-66. In affirming the partial denial of the defendant's motion to suppress, the Eighth Circuit took care to note that, not only had five days passed between the initial and subsequent questioning, but that the post-*Miranda* questioning "was conducted by an INS agent *who had no involvement in the earlier questioning*." *Id.* at 566 (emphasis added). Thus, the court concluded, "[i]t does not appear that the trooper, Border Patrol, and INS used a multi-step interrogation in a calculated way to undermine the *Miranda* warning." *Id.* (quotation omitted). Here, in contrast, *all* of the officers involved in both steps of

Ray's interrogation worked for the same police department, formed part of the same task force, and presumably had knowledge of Ray's initial, unwarned statements.

Under these circumstances, we conclude that the fourth *Seibert* factor was met because there was *practical* continuity of police personnel between Ray's initial and follow-on interrogations. If *absolute* continuity were the test, then police departments could easily circumvent it by having one officer conduct the pre-*Miranda* questioning while another officer listens in, only to have the second officer (or another officer with knowledge of the confession) conduct the follow-on, post-*Miranda* interrogation. That cannot be right.

### 6. The Degree to Which the Interrogators' Questions Treated the Second Round as Continuous with the First Suggests that the *Miranda* Warnings Were Ineffective.

Finally, the fifth *Seibert* factor—which assesses "the degree to which the interrogators' questions treated the second round as continuous with the first"—suggests that the *Miranda* warnings Ray received at the police station were ineffective. The district court reasoned that this prong "does not indicate that *Miranda* warnings were ineffective" because "[t]here was no evidence the interrogating police officers referenced or used Ray's prior admissions at the house in the interrogation at the police station." *Ray*, 2016 WL 3180184, at *5.

The record does not support the district court's conclusion. Once they advised Ray of his *Miranda* rights, Officers Robson and Hill asked him ten questions—several of which were derivative of his earlier admissions, even under the district court's factual findings regarding the "brief and cursory" statements Ray made at the house.

For example, the officers did not ask Ray if he knew about the guns being in the house or if he possessed a gun. Instead, they asked, "[w]hich guns found in the house belong to you," presumably because they knew Ray already admitted to owning at least one of the guns.

(Dist. Ct. Doc. 114-1, PageID 1374). Ray clarified that he owned only the shotgun found in the upstairs bedroom.

Likewise, the officers did not ask Ray general questions regarding past run-ins with the law or whether he had a prior record. Instead, they asked him more specifically if he was "aware that [he] was a convicted felon"—presumably because Ray already admitted to doing time in a federal prison while being questioned at the house. (*Id.*). The officers also asked a targeted question concerning whether Ray was "aware that owning a firearm is against the terms of [his] release," again, presumably as a follow-up to Ray's earlier admission about doing time. (*Id.*).

Those were the only questions the officers asked about the guns or Ray's status as a convicted felon. (*Id.*). This lack of questioning suggests that the officers had very little work to do at the post-*Miranda* interrogation because they were just following up on Ray's prior admissions. As in *Ashmore*, the officers "picked [their] line of questioning up post-*Miranda* right where [they] left off pre-*Miranda*—[they] wanted to know what [Ray] knew about the gun[s] that, by that time, had been found." 609 F. App'x at 317. This suggests that "the *Miranda* warnings did not effectively advise [Ray] that he had a real choice about giving an admissible statement because the unwarned and warned interrogations blended into one continuum." *Id.* (quotation omitted); *see also Pacheco-Lopez*, 531 F.3d at 427-28 (finding the fifth factor satisfied where interrogations seemed "continuous" and "part of one sequence").

In summary, the first, second, fourth, and fifth factors identified by the *Seibert* plurality all show that "a reasonable person in [Ray's] shoes could [not] have seen the station house questioning as a new and distinct experience," while the third factor does not illuminate the inquiry. *See Seibert*, 542 U.S. at 615 (plurality opinion). Under the totality of the circumstances, "[i]t would have been reasonable to regard the two sessions as parts of a continuum, in which it

would have been unnatural to refuse to repeat at the second stage what had been said before."
*See id.* at 617.

All told, "the *Miranda* warnings could [not] have made sense as presenting a genuine choice whether to follow up on [Ray's] earlier admission[s]," and suppression of his post-*Miranda* statements is required. *See id.* at 615-16; *see also Pacheco-Lopez*, 531 F.3d at 428 ("All five factors—and particularly factors three, four, and five—demonstrate that the *Miranda* warning was ineffective. As a result, Lopez's admission must be suppressed under *Seibert*'s effectiveness test.").

Because we find that Ray's station-house *Miranda* warnings were ineffective, we need not determine whether his *Miranda* waiver was made knowingly, voluntarily, and intelligently. *Seibert*, 542 U.S. at 612 n.4 (plurality opinion) (describing how a defendant cannot "waive" his *Miranda* rights if the underlying warning was ineffective); *Pacheco-Lopez*, 531 F.3d at 428 n.13 ("As discussed *supra*, the *Seibert* plurality explained that where a warning is ineffective, the defendant cannot waive his rights." (citing *Seibert*, 542 U.S. at 612 (plurality opinion))).

## IV. CONCLUSION

For these reasons, we reverse the district court's decision on remand; order the suppression of Ray's post-*Miranda* statements at the police station; and remand the case for a new trial consistent with this opinion.